******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RONALD GOLD, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED *v.*
JOHN ROWLAND ET AL.
(SC 19585)

Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.*

*Argued October 17, 2016—officially released April 11, 2017*

*E.J. Robbin Greenspan*, with whom were *Matthew T. Wax-Krell* and *Andrew W. Krevolin*, for the appellants (named plaintiff et al.).

*Adam K. Levin*, pro hac vice, with whom were *Patrick M. Fahey* and *Craig A. Hoover*, pro hac vice, and, on the brief, *Charles L. Howard* and *Peter R. Bisio*, pro hac vice, for the appellees (defendant Anthem, Inc., et al.).

*Opinion*

PALMER, J. This certified class action, which arises from a dispute over the proceeds of the 2001 demutualization of the defendant Anthem Insurance Companies, Inc. (Anthem Insurance), comes before this court for the second time. The plaintiffs are a class of state employees and retirees who, at the time of the demutualization, were enrolled in an Anthem Insurance group health care insurance plan. They contend that their participation in that plan entitled them to membership in Anthem Insurance and a share of the demutualization proceeds, and that Anthem Insurance and the other insurance company defendants; see part I E of this opinion; breached their contractual obligations by not paying the plaintiffs for their membership interests and instead distributing their share of the proceeds to the defendant state of Connecticut. The first time we considered this case, we concluded that all of the plaintiffs' claims against the named defendant, John Rowland, the former governor of Connecticut, and the state were barred by the doctrine of sovereign immunity or otherwise should have been dismissed. See *Gold* v. *Rowland*, 296 Conn. 186, 205, 209–11, 994 A.2d 106 (2010). Following our decision and a subsequent trial to the court of the plaintiffs' breach of contract claims against the remaining defendants, the trial court, *Bright, J.*, rendered judgment for those defendants. On appeal, the plaintiffs contend that the trial court incorrectly concluded that the relevant contract provisions were ambiguous and improperly consulted extrinsic evidence to determine their meaning. Finding no error, we affirm the trial court's judgment.[1]

# I

## FACTUAL AND PROCEDURAL HISTORY

Familiarity with the complete factual record, as detailed in the trial court's memorandum of decision, is presumed. The relevant facts, as found by the trial court or stipulated to by the parties, and procedural history may be briefly summarized as follows.

## A

### Merger of Anthem Insurance and Blue Cross

### and Blue Shield of Connecticut, Inc.

The dispute between the parties arises from three principal transactions and two group health care insurance policies. The first occurred on July 31, 1997, when Anthem Insurance, a mutual insurance company organized under Indiana law, merged with Blue Cross and Blue Shield of Connecticut, Inc. (Blue Cross), a mutual insurance company organized under Connecticut law. The merger was executed pursuant to a November, 1996 agreement to merge, which included as attachments a plan and joint agreement of merger, a proposed form of Anthem Insurance's third amended and restated arti-

cles of incorporation (1997 articles), and a form group guaranty health care insurance policy and certificate of membership (guaranty policy).[2] Under the plan and joint agreement of merger, Anthem Insurance was designated as the company that would survive the merger. Three months prior to the merger, in April, 1997, the directors and members of Anthem Insurance formally adopted the 1997 articles. Following the merger, Anthem Insurance, through its subsidiary, the defendant Anthem East, Inc., continued the former Blue Cross operations under the auspices of the defendant Anthem Health Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut (New CT-Blue).

Prior to their merger, the two mutual insurance companies took different approaches to membership. Under Anthem Insurance's premerger membership rules, each employee or individual holder of a certificate of coverage under a fully insured group health care insurance policy was an individual member and owner of Anthem Insurance. The employer, membership organization, or other group that procured the group coverage was not an owner member.

Under Blue Cross' premerger bylaws, by contrast, the employers were the owner members. Each employer was considered one policyholder and would designate a representative to act on behalf of the group for voting purposes. Individual employees who had been issued insurance certificates were not considered to be voting members with equity rights.

B

Relevant Health Care Insurance Policies

Before the merger, the state held two Blue Cross group health care insurance policies relevant to the present dispute.[3] The first, known as Care Plus, provided Medicare supplement group health care insurance for retired state employees and their dependents. The state closed enrollment in Care Plus to new members in 1994 but permitted enrolled members to retain their coverage. The Office of the Comptroller was designated as the voting member for that policy. In connection with the merger, New CT-Blue delivered a guaranty policy for Care Plus to the Office of the Comptroller.

The second plan originated as a Blue Cross health care insurance policy that was offered to state employees and non-Care Plus state retirees prior to 1993. In 1993, the state converted this policy to a self-funded, administrative services only contract with Blue Cross (ASO agreement). It is undisputed that the ASO agreement, as administered by Blue Cross after 1993, was not an insurance policy. Both Care Plus and the ASO agreement were active in 1997 when Anthem Insurance and Blue Cross merged, and they remained in effect through the first half of 1999.

On June 30, 1999, the state terminated the self-funded ASO agreement and instead entered into a new, fully insured group health care insurance policy from New CT-Blue (1999 group policy). Under the 1999 group policy, New CT-Blue began providing health care insurance benefits to substantially the same group of state employees and retirees who had been covered under the ASO agreement.

The following year, in July, 2000, the state also terminated the Care Plus plan. At that time, Care Plus covered 512 state retirees. Those retirees were given the option of enrolling in the 1999 group policy or in any of the other health care insurance plans available to state retirees. Unless they opted out, Care Plus members were, by default, enrolled in the 1999 group policy without a lapse in coverage. Approximately 456 of the 512 former Care Plus retirees ultimately were enrolled in the 1999 group policy without any lapse in coverage.

C

### Demutualization of Anthem Insurance

The second key transaction that gave rise to the present dispute occurred on June 18, 2001, when Anthem Insurance's board of directors approved a plan to convert from a mutual insurance company to a stock corporation under Indiana law.[4] Under the plan of conversion, upon the effective date of the demutualization, all of the outstanding capital stock of Anthem Insurance would be issued to the defendant Anthem, Inc., and eligible members of Anthem Insurance would become entitled to receive stock in Anthem, Inc., or cash, in exchange for the extinguishment of their membership interests in Anthem Insurance. The plan of conversion defined an eligible member as "a [p]erson who (a) is a [s]tatutory [m]ember of Anthem Insurance on the [a]doption [d]ate [June 18, 2001] and continues to be a [s]tatutory [m]ember of Anthem Insurance on the [e]ffective [d]ate [November 2, 2001], and (b) has had continuous health care benefits coverage with the same company during the period between those two dates under any [p]olicy or [p]olicies without a break of more than one day." During the relevant period from June 18 through November 2, 2001 (eligibility period), the plaintiffs continuously held certificates of coverage under the 1999 group policy.

D

### Stock Distribution

The third relevant transaction occurred between late 2001 and early 2002, when Anthem Insurance distributed more than 1.6 million shares of stock in Anthem, Inc., to the state, on the basis of its determination that the state—and not the individual state employees and retirees—was the eligible member under the 1999 group policy. Thereafter, the state sold the stock for

$93,768,950, transferred the proceeds to the general fund; see Public Acts, Spec. Sess., May, 2002, No. 02-1, § 39; and spent them. *Gold* v. *Rowland*, supra, 296 Conn. 193–94. Anthem Insurance made no distribution to the individual state employees and retirees under the 1999 group policy.

At the time of the demutualization, the state received notice thereof and was given the option to receive its share of the proceeds in stock or cash. There is no evidence that individual enrollees in the 1999 group policy received notice of the demutualization. However, public hearings concerning the demutualization were held before the Indiana Department of Insurance.

E

Procedural History

In January, 2002, the named plaintiff, Ronald Gold, a state employee, brought this action on his own behalf and on behalf of all others similarly situated, against the defendants, former Governor Rowland, the state, Anthem, Inc., New CT-Blue, Anthem East, Inc., and Anthem Insurance.[5] Gold initially filed a two count interpleader action alleging that, pursuant to the plan of conversion, he and other similarly situated state employees enrolled in the 1999 group policy were entitled to receive the 1.6 million shares of Anthem, Inc., stock that the insurance company defendants had issued to the state. In a second amended complaint, Gold claimed a right to the funds under various theories sounding in unjust enrichment, constructive trust, resulting trust, conversion of property, breach of duty, and unconstitutional takings and procedural due process violations.

Thereafter, former Governor Rowland and the state filed a motion to dismiss Gold's claims against them, arguing, among other things, that the claims were barred by the doctrine of sovereign immunity. The trial court, *Sheldon, J.*, concluded that Gold's common-law claims were barred by sovereign immunity and dismissed those claims. However, the court denied the motion to dismiss Gold's interpleader and state constitutional takings claims. On appeal, this court concluded that all of Gold's claims against former Governor Rowland and the state should have been dismissed. See id., 223.

Following the return of the case to the Superior Court, Gold filed the operative fourth amended complaint,[6] and Lois O'Connor, a former state employee who retired in 1997, was added as a plaintiff. In 2011, the case was assigned to the court, *Bright, J.* Class certification was granted to the group of state employees and retirees who continuously held a certificate of coverage under the 1999 group policy or who had continuous health care insurance coverage under that policy during the eligibility period but did not receive

compensation as a result of the demutualization.

In 2013, the plaintiffs and the insurance company defendants filed separate motions for summary judgment, each side claiming that the contract documents that governed the demutualization process and Anthem Insurance's relationship with the state and state employees required that judgment as a matter of law be rendered in their favor. The court denied the motions, concluding that the contract language regarding the distribution of demutualization proceeds was ambiguous[7] and, therefore, that it was necessary to consult extrinsic evidence of the parties' intent, and that there were genuine issues of material fact that needed to be resolved at trial.

The court bifurcated the proceedings, and the case proceeded to trial before the court solely on the issue of liability. The court heard testimony from a number of attorneys and other witnesses who were involved with the transactions at issue. Following the trial, the court issued a thoughtful and comprehensive memorandum of decision in which it concluded that (1) the various merger documents were all part and parcel of the same transaction, (2) when construed together, those documents are ambiguous with respect to the plaintiffs' entitlement to membership in Anthem Insurance and a share of the demutualization proceeds, and (3) the extrinsic evidence conclusively supported the insurance company defendants' interpretation of the merger documents, pursuant to which the state, rather than the plaintiffs, was the member entitled to the group's share of the demutualization proceeds. Consistent with these conclusions, the trial court rendered judgment in favor of the insurance company defendants.

The plaintiffs timely appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the plaintiffs contend that the 1997 articles unambiguously entitled them to the demutualization proceeds arising from the 1999 group policy and that the trial court improperly considered extrinsic evidence of the meaning of the relevant contract provisions. Consistent with this contention, they further claim that they are entitled to judgment as a matter of law. Additional facts will be set forth as necessary.

## II

## LEGAL ANALYSIS

We begin our analysis of the plaintiffs' claim by setting forth the standard of review and governing legal principles. "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . . [When] there is definitive contract language, [however] the determination of what the parties intended by their contractual commitments is a ques-

tion of law. . . . It is implicit in this rule that the determination as to whether contractual language is plain and unambiguous is itself a question of law subject to plenary review."[8] (Citations omitted; internal quotation marks omitted.) *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101–102, 84 A.3d 828 (2014).

Because the parties have agreed that Indiana law governs the 1997 articles and other documents at issue in this case, we apply the law of that state. See, e.g., *Hottle* v. *BDO Seidman, LLP*, 268 Conn. 694, 706, 846 A.2d 862 (2004). Under Indiana law, "[t]he ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement. . . . [Indiana courts] begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." (Citation omitted.) *CitiMortgage, Inc.* v. *Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). "Unless the terms of a contract are ambiguous, they will be given their plain and ordinary meaning." *Centennial Mortgage, Inc.* v. *Blumenfeld*, 745 N.E.2d 268, 273–74 (Ind. App. 2001).

"A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation." (Internal quotation marks omitted.) *CitiMortgage, Inc.* v. *Barabas*, supra, 975 N.E.2d 813. "The terms of a contract are not ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms." *Centennial Mortgage, Inc.* v. *Blumenfeld*, supra, 745 N.E.2d 274.

"If [a court] find[s] ambiguous terms or provisions in the contract, [it] will construe them to determine and give effect to the intent of the parties at the time they entered into the contract." (Internal quotation marks omitted.) *CitiMortgage, Inc.* v. *Barabas*, supra, 975 N.E.2d 813. "If . . . any terms of a [contract] are ambiguous, then the parties may introduce extrinsic evidence of its meaning, and interpretation of that term becomes a question of fact . . . ."[9] *Beradi* v. *Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. App. 1993). In such case, the finder of fact may consider any relevant extrinsic evidence of the parties' intent. See *University of Southern Indiana Foundation* v. *Baker*, 843 N.E.2d 528, 535 (Ind. 2006). This includes the circumstances surrounding the drafting of the agreement; see *Grant* v. *North River Ins. Co.*, 453 F. Supp. 1361, 1366 (N.D. Ind. 1978); statements made between the parties; see *Washburn-Crosby Milling Co.* v. *Brown*, 56 Ind. App. 104, 109, 104 N.E. 997 (1914); testimony or affidavits from attorneys who drafted the agreement; see *University of Southern Indiana Foundation* v. *Baker*, supra, 535; the conduct of the parties to the contract after it was formed; see *Peterson* v. *First State Bank*, 737 N.E.2d 1226, 1229–30 (Ind. App. 2000); *Pierce*

v. *Yochum*, 164 Ind. App. 443, 451, 330 N.E.2d 102 (1975); and subsequently prepared documents that reflect the parties' course of performance. See *Tender Loving Care Management, Inc.* v. *Sherls*, 14 N.E.3d 67, 72–73 (Ind. App. 2014).

In the event that review of extrinsic evidence of the parties' intent fails to resolve a contractual ambiguity, Indiana courts then apply the doctrine of contra proferentem, pursuant to which such ambiguities are construed against the drafter. See *Indiana-Kentucky Electric Corp.* v. *Green*, 476 N.E.2d 141, 146 (Ind. App. 1985). This doctrine is used only as a tie breaker, however, after all other rules of construction have been applied and all indicia of the parties' intent have been exhausted. See id.; see also *Bradley* v. *Western & Southern Financial Group*, Docket No. 2:05 CV 39, 2005 WL 2709282, *7 (N.D. Ind. October 20, 2005) ("the application of contra proferentem is premature in situations [in which] there has not yet been any attempt to resolve the ambiguity through the ordinary interpretive guides—namely, a consideration of the extrinsic evidence" [internal quotation marks omitted]); *Bradley* v. *Western & Southern Financial Group*, supra, *7 (explaining that, if doctrine of contra proferentem were applied at outset upon finding of ambiguity, then rule allowing for consideration of extrinsic evidence to interpret ambiguous contracts would be meaningless).

It also is black letter law that "a contract is considered as a whole so as to give effect to all its provisions without narrowly concentrating [on] some clause or language taken out of context." *Keystone Square Shopping Center Co.* v. *Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 422 (Ind. App. 1984). In addition, documents that are part of the "same transaction or subject matter will be construed together in determining the intent underlying the contracts." *Noble Roman's, Inc.* v. *Ward*, 760 N.E.2d 1132, 1138 (Ind. App. 2002); see also *State ex rel. Keith* v. *Common Council*, 138 Ind. 455, 461, 37 N.E. 1041 (1894) (contemporaneous writings so interrelated as to be deemed " 'part and parcel of the same contract' " may be read as one); *Salcedo* v. *Toepp*, 696 N.E.2d 426, 435 (Ind. App. 1998) ("[i]n the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction [or subject matter] will be construed together in determining the contract"). "Moreover, [as] long as two or more instruments are part of the same transaction, different execution times will not prohibit [the] instruments from being construed together." *Centennial Mortgage, Inc.* v. *Blumenfeld*, supra, 745 N.E.2d 275; see also *Gold* v. *Cedarview Management Corp.*, 950 N.E.2d 739, 743 (Ind. App. 2011). The contemporaneous document doctrine may even be applied when the documents at issue involve different parties, although caution must be exercised under those circumstances, and the determination that the documents constitute a sin-

gle agreement must be made on a case-by-case basis. Compare *Lily, Inc.* v. *Silco, LLC*, 997 N.E.2d 1055, 1068–69 (Ind. App. 2013) (applying doctrine even though only one entity was party to all three agreements at issue), transfer denied, 6 N.E.3d 950 (Ind. 2014), and *Roberts* v. *Vonnegut*, 58 Ind. App. 142, 146–49, 104 N.E. 321 (1914) (construing contract executed between corporation's principal shareholders together with creditors' extension agreement), with *Yessenow* v. *Hudson*, Docket No. 2:08-CV-353 (PPS), 2012 WL 2990643, *6–*7 (N.D. Ind. July 19, 2012) (declining to apply contemporaneous document doctrine when indemnification agreement at issue contained integration clause, was signed on different date than merger documents were, and was not necessary condition of completing merger), and *Murat* v. *South Bend Lodge No. 235 of the Benevolent & Protective Order of Elks*, 893 N.E.2d 753, 757–58 (Ind. App. 2008) (declining to apply contemporaneous document doctrine because deeds at issue served different purposes and did not cross-reference each other, and there was no evidence that parties intended them to form unitary contract), transfer denied, 915 N.E.2d 989 (Ind. 2009); see also *Beradi* v. *Hardware Wholesalers, Inc.*, supra, 625 N.E.2d 1261–63 (construing together documents signed by various corporate officers in both their individual and representative capacities); *Gilmore* v. *Century Bank & Trust Co.*, 20 Mass. App. 49, 56, 477 N.E.2d 1069 (1985) (factors influencing whether different instruments should be read together as components of single transaction include "simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdependency of provisions").

Indiana courts have applied these principles in the context of construing articles of incorporation in tandem with other corporate organizational documents. See, e.g., *Bay Colony Civic Corp.* v. *Pearl Gasper Trust*, 984 N.E.2d 231, 235 (Ind. App. 2013); *Heritage Lake Property Owners Assn., Inc.* v. *York*, 859 N.E.2d 763, 765–66 (Ind. App. 2007); *National Board of Examiners for Osteopathic Physicians & Surgeons, Inc.* v. *American Osteopathic Assn.*, 645 N.E.2d 608, 617 (Ind. App. 1994). This reflects the principle that "[t]he relation between a corporation and its stockholders is one of contract in which the articles of incorporation, [bylaws], provisions of the stock certificate, and pertinent statutes are embodied." *Scott* v. *Anderson Newspapers, Inc.*, 477 N.E.2d 553, 558 (Ind. App. 1985).

With these principles in mind, we turn our attention to the present dispute. The plaintiffs argue that (1) the 1997 articles represent the entirety of the relevant agreement, and (2) those articles unambiguously provide that the plaintiffs were members of Anthem Insurance who were entitled to a share of the demutualization proceeds. Because the relevant contractual language is unambiguous, the plaintiffs further contend, the trial court improperly considered extrinsic evidence

of the parties' intent. The insurance company defendants respond that the relevant agreement encompasses not only the 1997 articles but also the other merger documents. The insurance company defendants further maintain that the 1997 articles, both standing alone and when read in conjunction with the other merger documents, are ambiguous with respect to the plaintiffs' membership status and entitlement to demutualization proceeds. The insurance company defendants therefore contend that the trial court properly looked to extrinsic evidence to resolve this ambiguity.

We agree with the insurance company defendants that the 1997 articles and the other merger documents are part and parcel of the same transaction and that, when read together, they are ambiguous as to the plaintiffs' eligibility for membership in Anthem Insurance and their entitlement to a share of the demutualization proceeds relating to the 1999 group policy.[10] Accordingly, we conclude that the trial court properly consulted extrinsic evidence of their meaning.

## A

### Whether the Merger Documents Were Part

### and Parcel of a Single Transaction

We first consider whether the trial court correctly concluded that the 1997 articles were "part and parcel of the merger transaction" and, therefore, that it was appropriate to construe those articles in tandem with the other merger documents. As we previously noted, Indiana courts consider a number of factors when applying the contemporaneous document doctrine. These include (1) whether the documents were executed at the same time and by the same parties, (2) whether they address the same matter or transaction, (3) whether they reference or incorporate one another, (4) whether the execution of each document or fulfillment of the promises contained therein is a precondition for that of the others, and (5) whether the documents purport on their face to be fully integrated agreements. In the present case, most if not all of these factors favor construing the 1997 articles and the other merger documents as components of a single agreement.

First, there is little doubt that the 1997 articles and the other merger documents all were drafted in conjunction with the same transaction, namely, the 1997 merger between Anthem Insurance and Blue Cross. Indeed, the plaintiffs concede as much in their primary appellate brief: "*In connection with the proposed merger*, [Anthem Insurance's] attorney . . . drafted the agreement to merge . . . the plan and joint agreement of merger . . . the guaranty policies . . . and the [1997] . . . articles . . . ." (Citations omitted; emphasis added.) Notably, the plaintiffs also acknowledge that the membership rules contained in Anthem Insurance's

existing articles of incorporation needed to be revised in order to facilitate the merger with Blue Cross.

Second, the 1997 articles and the other merger documents contain multiple references to each other. Section 7.6 (b) of the 1997 articles provides in relevant part that, following a merger, former members of a qualified mutual insurer shall "become members of [Anthem Insurance] pursuant to, and shall be entitled to receive guaranty insurance policies/membership certificates . . . . Each such guaranty insurance policy/membership certificate shall continue in effect and confer membership and other rights . . . ." Section 8.5 then lays out the "[r]ights of [m]embers with [g]uaranty [p]olicies" in the event that Anthem Insurance were ever to demutualize. That section provides in relevant part: "Any member of [Anthem Insurance] who has an individual guaranty insurance policy of [Anthem Insurance] or a certificate of membership issued under a group guaranty insurance policy . . . shall be entitled, upon any . . . demutualization . . . of [Anthem Insurance] . . . to distributions in the form of cash, securities or other assets, and other membership and other rights and privileges . . . ." It is clear, then, that the 1997 articles envision that guaranty policies, such as those that were attached to the agreement to merge and subsequently provided to Blue Cross members, are the mechanism by which Blue Cross group policyholders were converted into members of the merged entity and invested with proprietary rights in the event of a subsequent demutualization. Section 7.6 (c) (2) of the 1997 articles also references the joint agreement of merger pursuant to which Anthem Insurance would consummate a merger with a qualified mutual insurer such as Blue Cross and provides that the merger agreement may restrict the conditions under which holders of certain types of insurance policies may become members of Anthem Insurance.

At the same time, there are numerous references to the 1997 articles throughout the agreement to merge, as well as in the plan and joint agreement of merger and the guaranty policy. For example, the agreement to merge provides that "the [m]erger shall constitute a '[q]ualified [m]embership [m]erger' under [Anthem Insurance's 1997 articles]"; the guaranty policy shall grant rights in the event of demutualization of the surviving corporation as set forth in the 1997 articles; and the guaranty policy shall grant voting rights in Anthem Insurance and rights in the event of demutualization as provided under Indiana's insurance law and in the 1997 articles. More significantly, an entire article of the agreement to merge, article IV, is addressed to the 1997 articles and the bylaws of the surviving corporation. Section 4.1 (a) requires that, "[a]t or before the [e]ffective [t]ime, the [a]rticles of [i]ncorporation of Anthem [Insurance] shall be amended and restated substantially in the form of the [t]hird [a]mended and [r]estated [a]rti-

cles of [i]ncorporation attached . . . as [e]xhibit C . . . . Such [a]rticles of [i]ncorporation shall, together with the provisions of the [p]lan and [j]oint [a]greement of [m]erger, among other matters: (1) provide to each former [Blue Cross] [m]ember the rights described in Section 3.4 [of the agreement to merge] . . . ." As required by that section, a proposed form of the 1997 amended articles was attached to the agreement to merge as exhibit C. Section 4.1 (b) also requires an amendment of the Anthem Insurance bylaws. The guaranty policies and the plan and joint agreement of merger, which also were attached as exhibits to the agreement to merge, likewise reference the 1997 articles.[11]

Third, and relatedly, it is clear that the agreement to merge not only referenced the 1997 articles but *required* their amendment as a condition of the merger. One of the covenants on which the agreement was predicated was that Anthem Insurance would amend the 1997 articles, substantially in the form proposed in exhibit C, prior to the effective date of the merger. As we previously discussed, § 4.1 defined the rights that the 1997 articles needed to provide with respect to members of the surviving entity. Moreover, § 9.1 of the agreement to merge required that "[Blue Cross] and Anthem [Insurance] . . . each take all actions necessary under their respective [c]ertificate or [a]rticles of [i]ncorporation and [bylaws] to convene a meeting of their respective policyholders/members . . . to vote on the [m]erger (*and with respect to Anthem [Insurance], the adoption of [Anthem Insurance's] [t]hird [a]mended and [r]estated [a]rticles of [i]ncorporation*) . . . ." (Emphasis added.) Section 9.3 made the completion of the merger conditional on the favorable outcome of those votes. Finally, article X of the agreement to merge, which is entitled "Conditions Precedent to Obligations of [Blue Cross] and Anthem [Insurance]," expressly provided that "[t]he obligations of [Blue Cross] and Anthem [Insurance] to consummate the [m]erger shall be subject to fulfillment as of or before the [e]ffective [t]ime of each of the following conditions . . . .

"The [a]rticles of [i]ncorporation of the [s]urviving [c]orporation shall, prior to or as of the [e]ffective [t]ime, be substantially in the form attached hereto as [e]xhibit C . . . ." Section 11.2 further required that Anthem Insurance comply with all of its obligations under the agreement to merge as a condition precedent to the obligations of Blue Cross. It is clear, then, that Anthem Insurance's adoption of the 1997 articles was inextricably bound up with the merger agreement. This is true even though the 1997 articles do not specifically refer to the Blue Cross merger and were drafted to accommodate not only that agreement but also any similar mergers that might be consummated in the future.

Fourth, the 1997 articles do not contain an integration clause or otherwise purport to be a complete expression of the agreement between Anthem Insurance and its members. Although the agreement to merge does contain an integration clause, that document also incorporates as attached exhibits both the 1997 articles and the other merger documents. Accordingly, the integration clause does not indicate that the parties to the agreement to merge intended the agreement to be construed separate and apart from the 1997 articles. See *Benkelman* v. *Baseline Engineering Corp.*, Docket No. 7:15CV5003, 2016 WL 1092476, *5 (D. Neb. March 21, 2016) (attached agreement treated as part of integrated contract).[12]

It is apparent, then, that the 1997 articles are inseparably intertwined with the other merger documents. Amendment of the 1997 articles by the members of Anthem Insurance was necessary to facilitate the merger and, therefore, was made an express condition precedent to the completion of the merger. As the trial court found, "[t]he [1997] articles were an essential part of the agreement to merge, and the merger could not take place without the articles being approved." At the same time, the guaranty policies were the mechanism by which the membership rights afforded by the 1997 articles were extended to both former members of Blue Cross and new enrollees in New CT-Blue. For these reasons, the trial court correctly concluded that the 1997 articles and the other merger documents were part and parcel of a single transaction.

The plaintiffs reject this conclusion largely because (1) the other merger documents were signed on different dates than the 1997 articles were, and (2) whereas Anthem Insurance and Blue Cross were parties to the other merger documents, the parties to the 1997 articles were Anthem Insurance and its members. To the extent that these contentions are accurate, we are not persuaded that they tip the scales in favor of treating the other merger documents as extrinsic evidence vis-a-vis the 1997 articles. With respect to the dates of signing, the relevant timeline of events is as follows:

(1) Spring, 1996: Blue Cross and Anthem Insurance enter into merger negotiations;

(2) October 17, 1996: Anthem Insurance's board of directors casts a preliminary vote to approve the 1997 articles;

(3) November 8, 1996: Blue Cross and Anthem Insurance sign the agreement to merge, with the proposed 1997 articles and guaranty policy attached, and approval of the merger is sought from the Connecticut Insurance Department;

(4) December 19, 1996: Anthem Insurance's board of directors casts the final vote to approve the 1997 articles;

(5) March 27, 1997: Anthem Insurance members vote to adopt the 1997 articles, and Blue Cross members vote to approve the merger;[13]

(6) April 17, 1997: The 1997 articles are executed;

(7) May 27, 1997: The Commissioner of the Indiana Department of Insurance approves the 1997 articles; and

(8) July 31, 1997: Anthem Insurance and Blue Cross sign the plan and joint agreement of merger, and the Connecticut Insurance Department approves the merger, which becomes effective.

In light of the complexity of these transactions and the need for multiple rounds of approval by Anthem Insurance's board of directors and membership of both entities, in addition to approval by regulatory agencies in two states, the fact that all of the relevant documents were not executed simultaneously on one date does not compel the conclusion that they were not intended to be part and parcel of a single agreement. Rather, the timeline suggests that drafting and approval of the 1997 articles transpired over a seven month period that dovetailed closely with the multistep approval of the merger. It is noteworthy in this respect that the membership of Blue Cross voted to approve the merger on the very same date that their Anthem Insurance counterparts signed off on the 1997 articles.

Nor are we persuaded by the plaintiffs' argument that the other merger documents are extrinsic to the 1997 articles because different parties entered into those agreements. It is true that, technically, the 1997 articles—as well as the guaranty policy—represent agreements between Anthem Insurance and its members, whereas the agreement to merge and the plan and joint agreement of merger were agreements between Anthem Insurance and Blue Cross. The reality, however, is that Anthem Insurance's attorney drafted each of these documents, and each effectively required the approval of Anthem Insurance, Blue Cross, and their respective members. As we previously noted, the 1997 articles and the guaranty policy were attached to the agreement to merge and thereby incorporated into the contract between Anthem Insurance and Blue Cross. At the same time, the agreement to merge, as well as the plan and joint agreement of merger, required the approval not only of Blue Cross and Anthem Insurance, but also of Anthem Insurance's membership.[14] For these reasons, the fact that the Anthem Insurance members themselves were not signatories to each of the merger documents, or that Blue Cross was not a signatory to the 1997 articles, does not bar the conclusion that these documents were part and parcel of a single transaction.

B

Whether the Merger Documents Were Ambiguous

Having concluded that the trial court correctly determined that the 1997 articles must be construed in tandem with the other merger documents, we next turn our attention to the question whether the court properly determined that those documents, when read together, are ambiguous with respect to whether the plaintiffs were Anthem Insurance members entitled to a share of the demutualization proceeds.[15] We begin by setting forth the relevant contract language.

1

1997 Articles

Because the plaintiffs' claims arise primarily from rights allegedly bestowed on them by the 1997 articles, we begin by setting forth the relevant provisions of that document. Article VII of the 1997 articles defines the criteria for membership in Anthem Insurance. Section 7.1 provides that the members of Anthem Insurance shall be "(a) all persons to whom certificates of membership are issued, and (b) all persons who have the rights of members granted to them under insurance agreements made between [Anthem Insurance] and employers, or group agents, of such persons acting for and on their behalf. Membership . . . shall be evidenced by certificates of membership . . . ." Sections 7.2 through 7.5 address the membership rights of former members of two other mutual insurance companies that merged with Anthem Insurance prior to 1997 and whose membership rules had been similar to those of Blue Cross, with group policyholders rather than individual enrollees possessing membership rights. Section 7.6 essentially represents a generic version of those provisions, which allowed Anthem Insurance to accommodate the Blue Cross merger and to honor Blue Cross' membership rules, but was written in general terms so that future " '[q]ualified [m]embership [m]ergers' " with mutual insurance companies similar to Blue Cross could be accomplished without further need to amend the articles of incorporation.

Section 7.6 (a) defines, among other things, the qualified membership mergers to which § 7.6 applies. It is undisputed that the merger between Anthem Insurance and Blue Cross was a qualified membership merger and that, following the merger, New CT-Blue was a " '[q]ualified [m]embership [s]ubsidiary' " of Anthem Insurance as defined in § 7.6 (a) (3).

Section 7.6 (b) of the 1997 articles is entitled "Former Members of Qualified Mutual Insurers." It addresses the membership rights of groups and individuals who were mutual members of companies such as Blue Cross at the time of merger. Section 7.6 (b) provides: "Upon effectiveness of a [q]ualified [m]embership [m]erger, all of the members of the [q]ualified [m]utual [i]nsurer shall (1) retain their insurance and/or medical and health benefits under [q]ualified [c]ontracts, and (2) become

members of [Anthem Insurance] pursuant to, and shall be entitled to receive guaranty insurance policies/membership certificates issued by [Anthem Insurance] in respect of such [q]ualified [c]ontracts. Each such guaranty insurance policy/membership certificate shall continue in effect and confer membership and other rights in [Anthem Insurance] as long as . . . the related [q]ualified [c]ontract is in effect, or has been renewed, amended, or replaced, without a lapse in coverage, by any insurance policy or health care benefits contract issued by a [q]ualified [m]embership [s]ubsidiary for that [q]ualified [m]embership [m]erger . . . ." It is undisputed that the state's Care Plus policy with Blue Cross was a qualified contract as defined in the 1997 articles.

Section 7.6 (c) of the 1997 articles is entitled "New Members Under Post-Merger Policies, Contracts and Certificates of Qualified Membership Subsidiaries." Subdivision (1) of § 7.6 (c) provides in relevant part: "Except as set forth in [Section] 7.6 (c) (2) and (3) . . . each holder of an individual insurance policy or health care benefits contract, and each holder of a certificate of coverage under a group insurance policy or health care benefits contract, which individual or group policy or contract is originally issued by a [q]ualified [m]embership [s]ubsidiary for that [q]ualified [m]embership [m]erger after the effectiveness of such [m]erger, shall be entitled to receive a guaranty insurance policy or certificate of membership from [Anthem Insurance]. Each such individual guaranty insurance policy and each such certificate of membership issued under a group guaranty insurance policy shall grant the following rights: (i) voting rights on all matters that come before the members of an Indiana domestic mutual insurance company under Indiana [i]nsurance [l]aw . . . (ii) a guarantee of the benefits provided under the insurance policy or health care benefits contract issued by the [q]ualified [m]embership [s]ubsidiary; and (iii) rights in the event of a liquidation, merger, consolidation, demutualization or conversion of [Anthem Insurance] described in Section 8.1, as provided under the Indiana [i]nsurance [l]aw and as set forth in [a]rticle VIII."

Subdivision (3) of § 7.6 (c) provides in relevant part: "Section 7.6 (c) (1) shall apply only with respect to insurance policies and health care benefits contracts, and certificates of coverage thereunder, issued by a [q]ualified [m]embership [s]ubsidiary after the effectiveness of the [q]ualified [m]embership [m]erger and shall not apply with respect to [q]ualified [c]ontracts (or certificates of coverage thereunder) as described in Section 7.6 (b), *or any insurance policy or health care benefits contract issued as a renewal, amendment or replacement of such [q]ualified [c]ontracts* (or certificates of coverage thereunder) where there was no lapse of coverage." (Emphasis added.)

Article VIII of the 1997 articles, which is entitled, "Liquidation, Merger or Demutualization," addresses the rights of Anthem Insurance members in the event of demutualization or other corporate change. Section 8.1 provides in relevant part that "[a]ll members of [Anthem Insurance] shall be entitled, upon any . . . demutualization or conversion of [Anthem Insurance] from a mutual to a stock insurance company, to such distributions in the form of cash, securities or other assets, and such other membership and other rights and privileges, as may from time to time be provided by the Indiana [i]nsurance [l]aw. . . ."

Section 8.4 of the 1997 articles specifically addresses the rights of the former members of a qualified mutual insurer such as Blue Cross in the event of a subsequent, postmerger demutualization of Anthem Insurance. Section 8.4 (a) provides in relevant part: "By virtue of a [q]ualified [m]embership [m]erger . . . all of the members of the [q]ualified [m]utual [i]nsurer become members of [Anthem Insurance], and all of the assets and surplus of the [q]ualified [m]utual [i]nsurer become assets and surplus of [Anthem Insurance]. Accordingly, upon any . . . demutualization or conversion of [Anthem Insurance] . . . in the determination of the rights of any member of [Anthem Insurance] who was immediately prior to a [q]ualified [m]embership [m]erger, a member of the [q]ualified [m]utual [i]nsurer, full account and credit shall be given to such member of its former interests in that [q]ualified [m]utual [i]nsurer, which rights shall reflect and include in full . . . the value of such member's interests in that [q]ualified [m]utual [i]nsurer immediately prior to the [q]ualified [m]embership [m]erger . . . ." Section 8.5 of the 1997 articles further provides that an Anthem Insurance member holding a guaranty policy or certificate of membership issued by a qualified membership subsidiary is entitled, in the event of a demutualization, to asset distributions equivalent to those to which a member would be entitled if he or she had held a policy or certificate issued by Anthem Insurance itself.

Section 8.6 of the 1997 articles is entitled "Rights of Members with Substituted Policies" and further defines the rights of members of a qualified mutual insurer, such as Blue Cross, in the event of a postmerger demutualization or other transaction. That section provides in relevant part: "Upon any . . . demutualization or conversion of [Anthem Insurance] . . . in the determination of the rights of any member of [Anthem Insurance] who has had two or more insurance policies or certificates of membership, including renewed, amended or replaced policies or certificates, issued by [Anthem Insurance] successively without any lapse in coverage, full account and credit shall be given to such member of the value of such member's interest in [Anthem Insurance] under all such policies or certifi-

cates. Without limiting the foregoing . . . (iii) in the case of each member holding a [q]ualified [m]embership [s]ubsidiary insurance policy or health care benefits contract who was a member of the [q]ualified [m]utual [i]nsurer immediately prior to the [q]ualified [m]ember-ship [m]erger and whose [q]ualified [m]embership [s]ubsidiary contract has been renewed, amended or replaced by any policy or contract of a [q]ualified [m]embership [s]ubsidiary in that [q]ualified [m]ember-ship [m]erger without a lapse in coverage, such value shall reflect and include in full the value of such member's interest in [Anthem Insurance] immediately prior to the renewal, amendment or replacement . . . ."

Finally, § 8.7 of the 1997 articles provides: "Whenever any corporate transaction or event affects the members' interests in [Anthem Insurance], consideration is to be given to the members of [Anthem Insurance] who were . . . (iii) immediately prior to a [q]ualified [m]ember-ship [m]erger, members of the [q]ualified [m]utual [i]nsurer or [Anthem Insurance], respectively, such that their individual interests in the [q]ualified [m]utual [i]nsurer or [Anthem Insurance], respectively, immedi-ately prior to the [q]ualified [m]embership [m]erger are fully and equitably reflected."

2

Other Merger Documents

We next set forth the relevant provisions of the other merger documents. Turning our attention to the agreement to merge, we note that §§ 3.3 and 3.4 of that document address the rights of former Blue Cross group policyholders after the merger, whereas § 8.6 (c) addresses the rights of holders of new New CT-Blue group policies issued after the merger. Section 3.3 pro-vides in relevant part that "each [Blue Cross] [m]ember shall, by virtue of the [m]erger and without any action on the part of such person, receive in exchange for such person's interests in [Blue Cross] . . .

"(b) a new [s]urviving [c]orporation guaranty policy (the forms of which policies shall be substantially as attached hereto as [e]xhibit B) which shall grant to such person the rights described in Section 3.4."

Section 3.4 in turn provides in relevant part: "All guaranty policies issued by the [s]urviving [c]orporation pursuant to Section 3.3 shall grant the following rights:

"(a) voting rights . . .

"(b) insurance benefits . . . and

"(c) rights in the event of the . . . demutualization of the [s]urviving [c]orporation as set forth herein . . . and in the [s]urviving [c]orporation's . . . [a]rticles of [i]ncorporation . . . . The [s]urviving [c]orporation guaranty insurance policy shall continue in effect as long as (1) the health insurance policy or healthcare benefits contract assumed or issued by New CT-Blue

. . . is in effect or has been renewed, amended, or replaced, without a lapse in coverage, by any New CT-Blue health insurance policy or healthcare benefits contract . . . ."[16]

With respect to membership rights arising from new group insurance policies issued by New CT-Blue after the merger, § 8.6 (c) of the agreement to merge provides in relevant part: "Except as set forth below . . . each holder of a certificate of coverage under a group New CT-Blue insurance policy or healthcare benefits contract originally issued . . . after the [e]ffective [t]ime, shall be entitled to receive an Anthem [Insurance] certificate of membership issued under an Anthem [Insurance] group guaranty insurance policy. Each such . . . certificate of membership . . . shall grant . . . (1) voting rights . . . (2) insurance benefits . . . and (3) rights in the event of the . . . demutualization of Anthem [Insurance] . . . .

"This Section 8.6 (c) shall apply only with respect to New CT-Blue insurance policies or healthcare benefits contracts (and certificates of coverage thereunder) originally issued after the [e]ffective [t]ime, and shall not apply to New CT-Blue insurance policies or healthcare benefits contracts (or certificates of coverage thereunder) required to be assumed or issued pursuant to Article III. Nothing contained in . . . Section 8.6 (c) shall affect or alter in any manner the obligations of the parties under [a]rticle III."

In addition, § 4.1 of the agreement to merge requires that "the [a]rticles of [i]ncorporation of Anthem [Insurance] . . . be amended and restated substantially in the form of the [t]hird [a]mended and [r]estated [a]rticles of [i]ncorporation attached . . . as [e]xhibit C . . . . Such [a]rticles of [i]ncorporation shall, together with the provisions of the [p]lan and [j]oint [a]greement of [m]erger, among other matters: (1) provide to each former [Blue Cross] [m]ember the rights described in Section 3.4; (2) provide to the extent applicable the rights described in Section 3.4 to:

"(i) each future New CT-Blue certificate holder under a group insurance policy or healthcare benefits contract originally issued after the [e]ffective [t]ime, and

"(ii) each future holder of [a] New CT-Blue individual insurance policy or healthcare benefits contract originally issued after the [e]ffective [t]ime,

"who also holds a [s]urviving [c]orporation insurance policy or membership certificate that guarantees the benefits granted by such New CT-Blue certificate or individual policy or contract . . . ."

We next set forth the relevant language contained in the Anthem Insurance guaranty policy that was sent to Blue Cross group policyholders, including the state, at the time of the merger. Exhibit B-2 to the agreement to merge is entitled "[FORM] GROUP GUARANTY

HEALTH POLICY AND CERTIFICATE OF MEMBER-SHIP." Article IV of the guaranty policy addresses membership rights and provides in relevant part: "As long as this [p]olicy is in effect, the Anthem [Insurance] [m]ember shall be entitled to all of the rights of membership in Anthem [Insurance] accorded to members of a mutual insurance company under Indiana law, including the right to one vote . . . and equity rights in the event of . . . demutualization as provided in [Anthem Insurance's] [a]rticles of [i]ncorporation from time to time in effect. Such equity rights . . . shall accrue solely to the Anthem [Insurance] [m]ember. No [e]nrollee or dependent of an [e]nrollee shall receive any equity rights by virtue of being an [e]nrollee or dependent of an [e]nrollee. As provided in [Anthem Insurance's] [a]rticles of [i]ncorporation from time to time in effect, the Anthem [Insurance] [m]ember's rights shall reflect and include in full the value of the Anthem [Insurance] [m]ember's interest in Blue Cross . . . immediately prior to the merger . . . together with any subsequent accretions or reductions to that value . . . resulting from changes in the entire net worth of Anthem [Insurance] on a consolidated basis following the merger."

The "[d]efinitions" section of the guaranty policy further provides that the "CT-Blue Contract . . . shall include any renewal or amendment, or any replacement thereof issued by [New] CT-Blue," and that an "[e]nrollee . . . means each person who has enrolled for insurance or health care benefits under the . . . [c]ontract and who was eligible to enroll for such benefits . . . because of the person's status as (1) an employee of the Anthem [Insurance] [m]ember, if the Anthem [Insurance] [m]ember is an employer . . . ."

Finally, article VI of the guaranty policy governs the term and termination of that policy and provides that, "[u]nless cancelled . . . this [p]olicy shall remain in full force and effect for as long as the . . . [c]ontract is in effect, or has been renewed, amended, or replaced by any [New] CT-Blue [c]ontract without a lapse in coverage, and the Anthem [Insurance] [m]embership [f]ees are paid prior to the expiration of the [g]race [p]eriod set forth in [a]rticle VII of this [p]olicy."

3

Arguments and Analysis

The plaintiffs contend that the plain language of the 1997 articles provides that they were members of Anthem Insurance who were entitled to a share of the demutualization proceeds. Specifically, the plaintiffs rely on the facts that (1) they undisputedly held certificates of coverage under the 1999 group policy, which was issued by New CT-Blue in 1999 and was, therefore, a postmerger policy of a qualified membership subsidiary, and (2) pursuant to § 7.6 (c) (1) of the 1997 articles,

unless one of two exceptions applies, "each [individual] holder of a certificate of coverage under a group insurance policy . . . originally issued by a [q]ualified [m]embership [s]ubsidiary . . . after the . . . [m]erger . . . [is] entitled to receive a . . . certificate of membership from [Anthem Insurance that shall grant] . . . rights in the event of a . . . demutualization . . . ." It is undisputed that the first exception to § 7.6 (c) (1), which is contained in § 7.6 (c) (2), does not apply. The plaintiffs maintain that the second exception, which is contained in § 7.6 (c) (3), also does not apply. Subdivision (3) provides that § 7.6 (c) (1) "shall not apply with respect to . . . any insurance policy or health care benefits contract *issued as* a renewal, amendment or replacement" of qualified contracts held by members of a qualified mutual insurer such as Blue Cross prior to the merger. (Emphasis added.) In other words, if New CT-Blue issued a new group insurance policy after the merger of Anthem Insurance and Blue Cross, the employees who obtained coverage under that group policy were entitled to membership in Anthem Insurance unless the "new" policy was merely issued as a renewal, amendment, or replacement for a Blue Cross group policy that was in place before the merger. In that case, the new policy would be treated as a continuation of the premerger policy, and Blue Cross' premerger membership rules—pursuant to which the group policyholder, rather than its employees, is the member—would remain in effect.

In the present case, it is undisputed that, although the 1999 group policy did ultimately replace the state's Care Plus policy, it was not *issued as* a replacement for that policy. Rather, the 1999 group policy was issued in July, 1999, as a replacement for the ASO agreement, which the parties agree was not a qualified insurance policy. The 1999 group policy coexisted with Care Plus for one year until Care Plus was terminated in July, 2000, and its enrollees defaulted into the 1999 group policy. Under the plaintiffs' theory of the case, then, the exception contained in § 7.6 (c) (3) of the 1997 articles does not apply to state employees who obtained coverage under the 1999 group policy, and a straightforward reading of § 7.6 conclusively establishes that they became Anthem Insurance members upon receiving certificates of coverage under that policy.[17]

Although the plaintiffs would conclude the analysis there, they also argue that, to the extent that the other merger documents are relevant, those documents support their reading of the 1997 articles. With respect to the agreement to merge, for example, the plaintiffs point to § 4.1 (a), which requires that the 1997 articles provide membership rights to holders who are issued New CT-Blue group certificates after the merger. The plaintiffs also direct our attention to § 8.6 (c) of the agreement to merge, which entitles such holders to receive certificates of membership.

In general, the view of the plaintiffs is that the merger documents contain two parallel sets of provisions. One set, exemplified by § 7.6 (b) of the 1997 articles, extends membership rights to former members of qualified mutual insurers, including policyholders, such as the state, that held group policies under and were members of Blue Cross. Those provisions ensure that, as long as those policies remain in effect, the policyholders retain the same equity interests in the merged entity as they held in Blue Cross prior to the merger. The other set of provisions, exemplified by § 7.6 (c) of the 1997 articles, extends membership rights to individual enrollees in new group health care insurance plans issued by qualified membership subsidiaries such as New CT-Blue after the merger and allows those enrollees, upon demutualization, to recoup the equity generated by their post-merger participation in Anthem Insurance. The plaintiffs contend that nothing in any of the merger documents suggests that these two sets of provisions are mutually exclusive, or that a single Blue Cross customer[18] such as the state cannot simultaneously hold (1) premerger group policies, under which the employer qualifies as an Anthem Insurance member, and (2) unrelated, postmerger group policies, under which the employee enrollees qualify as members.

By contrast, the insurance company defendants contend, and we agree, that a reasonable person could interpret the merger documents differently and, therefore, that the documents are ambiguous with respect to the membership issue. Their view is that group policyholders that were Blue Cross members before the merger became members of Anthem Insurance upon their receipt of guaranty policies or membership certificates and that, thereafter, as long as they retained their membership status (by maintaining a qualified policy without lapse), their equity rights in Anthem Insurance extended to *any* group policies that they held, including new, unrelated policies issued by New CT-Blue. In other words, those groups were grandfathered under the premerger Blue Cross membership rules with respect to any policies that they initially held or later came to acquire.

In the present case, the state was issued a membership certificate in Anthem Insurance by virtue of its Care Plus policy and retained its membership status until the demutualization because Care Plus was replaced by the 1999 group policy. For this reason, the insurance company defendants contend, the premerger Blue Cross membership rules that were preserved in § 7.6 (b) of the 1997 articles apply to all enrollees in the 1999 group policy. This is true, the insurance company defendants maintain, regardless of the fact that the 1999 group policy initially was issued as a new group policy postmerger, rather than as a replacement for a premerger policy, and initial enrollees may not have been

certificate holders under a state Blue Cross plan prior to the merger.

Several provisions of the merger documents support the interpretation advanced by the insurance company defendants, or, at minimum, create an ambiguity with respect to the membership question. First and foremost, article IV of the guaranty policy, a copy of which was given to the state and other former Blue Cross members, clearly provides that "[a]s *long as this* [p]*olicy is in effect*, the Anthem [Insurance] [m]ember shall be entitled to all of the rights of membership in Anthem [Insurance] . . . including . . . equity rights in the event of . . . demutualization . . . . Such equity rights . . . shall accrue *solely* to the Anthem [Insurance] [m]ember. *No* [e]*nrollee* . . . *shall receive any equity rights by virtue of being an* [e]*nrollee* . . . ." (Emphasis added.) According to its plain terms, then, the certificate of membership, which represents the state's membership contract with Anthem Insurance, provides that only the Anthem Insurance member and no enrollees will be entitled to equity rights in Anthem Insurance, *as long as the guaranty policy remains in effect*. See footnote 16 of this opinion.

The plaintiffs respond that article IV of the guaranty policy merely indicates that no individual was entitled to become a member or receive equity rights by virtue of being an enrollee *in Care Plus*. They contend, however, that they *are* entitled to membership by virtue of being enrollees in the 1999 group policy.

Although the plaintiffs' interpretation of article IV is perhaps plausible, it is certainly not the only reasonable reading of that provision, let alone the better one. Nothing in the guaranty policy indicates that the membership and equity rights afforded by article IV are restricted to a particular underlying health care benefits contract. Moreover, although the definitions section of the guaranty policy does suggest that an attached schedule was to have identified particular benefits contracts to which other articles of the guaranty policy applied, the plaintiffs concede that the schedule that was delivered to the state was not completed. The record also does not contain any indication whether the 1999 group policy was later added to that schedule.[19]

We note in this respect that the record does contain a corresponding form group guaranty health care policy that was given to policyholders who obtained new group policies from New CT-Blue after the merger. The section of that guaranty policy corresponding to article IV provides that "equity rights . . . shall accrue solely to the Anthem [Insurance] [m]ember. No [p]olicyholder . . . shall receive any equity rights by virtue of being a [p]olicyholder . . . ." It is undisputed that the state never received any such guaranty policy in connection with the 1999 group policy. Accordingly, we conclude that it is at least ambiguous whether article IV of the

group guaranty health care policy precluded individual enrollees in *any* state Blue Cross health care plans from obtaining membership and equity rights in Anthem Insurance, by virtue of their enrollment therein, as long as the state maintained its membership status.

Second, the insurance company defendant's interpretation of the guaranty policy finds support in the agreement to merge. Specifically, §§ 3.3 and 3.4 of the agreement to merge appear to delink the membership and equity rights afforded by a guaranty policy from the specific underlying health care insurance policy or policies. Subsection (a) of § 3.3 provides that, by virtue of the merger, Blue Cross members were entitled to receive a health care benefit contract from New CT-Blue with the same terms and conditions as each Blue Cross policy they held before the merger. Section 3.3, by contrast, entitles each member to one guaranty policy "in exchange for [that member's] interests in [Blue Cross] . . . ." Similarly, § 3.4 (b) provides that the guaranty policy will "guarantee the benefits granted under *each* health insurance policy or [health care] benefits contract issued or assumed by New CT-Blue"; (emphasis added); whereas § 3.4 (a) and (c), respectively, require that the guaranty policy grant voting rights and equity rights in the event of demutualization.

Read together, then, the relevant provisions of the agreement to merge and the guaranty policy strongly suggest that each former Blue Cross member such as the state was to receive a single guaranty policy that served two purposes. First, the policy guaranteed for each premerger group health insurance plan held by the member that the enrollees would be entitled to the same health care benefits to which they were entitled under Blue Cross. Second, the guaranty policy granted membership, voting, and equity rights in the merged entity, rights that the member would retain as long as the member maintained a qualified policy without lapse. Because these rights are granted in exchange for the member's interests in Blue Cross, and are not tied to any particular health care contract, the provisions in the guaranty policy that the "equity rights . . . shall accrue *solely* to the Anthem [Insurance] [m]ember . . . [and that] [n]o [e]nrollee . . . shall receive any equity rights by virtue of being an [e]nrollee" are most reasonably understood to apply with respect to any qualifying group plan effective during the course of the member's membership in Anthem Insurance.[20] (Emphasis added.)

Third, although the relevant language of the 1997 articles generally favors the plaintiffs' position, the insurance company defendants point to certain ambiguities in the 1997 articles themselves with regard to the membership issue. The most compelling of these arises from § 8.6, which provides in relevant part: "Upon any . . . demutualization or conversion of [Anthem Insurance] . . . in the determination of the rights of any

member of [Anthem Insurance] who has had two or more insurance policies or certificates of membership, including renewed, amended or replaced policies or certificates, issued by [Anthem Insurance] successively without any lapse in coverage, full account and credit shall be given to such member of the value of such member's interest in [Anthem Insurance] under all such policies or certificates. . . ." Unlike § 7.6 (c) (3), this provision appears to extend to former Blue Cross members equity rights in any policies that replaced qualifying Blue Cross policies, and not only those new policies that were "issued as" replacements thereof.[21] It thus provides support for the insurance company defendants' argument that the "issued as" language in § 7.6 (c) (3) of the 1997 articles merely reflected inartful draftsmanship and was not intended to confer special status on enrollees in health plans such as the 1999 group policy, which replaced but was not issued as a replacement for Care Plus.[22]

Lastly, we note that, when confronted with similar challenges brought by a class of employees and retirees of the city of Cincinnati, Ohio, following the 1995 merger of Anthem Insurance's predecessor company with Community Mutual Insurance Company and the subsequent demutualization of that predecessor company, the United States Court of Appeals for the Sixth Circuit held that the District Court properly had granted summary judgment for the defendants. See *Mell* v. *Anthem, Inc.*, 688 F.3d 280, 290 (6th Cir. 2012). The Sixth Circuit relied heavily on the provision of the corresponding guaranty policy stating that "[n]o [e]nrollee . . . shall receive any equity rights by virtue of being an [e]nrollee . . . ." (Internal quotation marks omitted.) Id., 288. For all of the foregoing reasons, we conclude that the trial court correctly determined that the merger documents are ambiguous with respect to whether the plaintiffs were entitled to membership in Anthem Insurance and the associated demutualization proceeds by virtue of their enrollment in the 1999 group policy.[23]

C

Use of Extrinsic Evidence and the Application

of the Rule of Contra Proferentem

Finally, we consider whether the trial court properly determined, upon review of the extrinsic evidence, that it was the intention of the parties to the 1997 articles and the other merger documents that the plaintiffs and others similarly situated would not be entitled to a share of the proceeds in the event that Anthem Insurance were to demutualize. In view of the abundant extrinsic evidence supporting the insurance company defendants' position, the plaintiffs do not contest the court's factual finding that the parties to the agreement to merge—Anthem Insurance and Blue Cross—intended that, after the merger, only the state and not individual

enrollees in state Blue Cross health care insurance plans would become member owners of Anthem Insurance. Rather, the plaintiffs contend that the trial court improperly (1) considered evidence of the parties' intent that was never expressed to either the state or the individual enrollees in state Blue Cross health care plans, (2) considered evidence of intent that was not expressed until after the adoption of the 1997 articles, and (3) failed to apply the rule of contra proferentem and to construe the 1997 articles against Anthem Insurance, the primary drafter thereof.

The following additional facts are relevant to the plaintiffs' arguments. In its memorandum of decision, the trial court considered, among other things, four types of extrinsic evidence in determining that the relevant contract language recognized premerger Blue Cross group policyholders such as the state as member owners of the merged entity and would not permit both the state and the enrollees in the 1999 group policy to simultaneously be member owners.

First, the court credited testimony by various officers and agents of Blue Cross and Anthem Insurance that both companies, when negotiating the merger, intended that the Blue Cross membership system would be retained for Blue Cross members, and that individual enrollees in Blue Cross group health care insurance policies would not become members of or acquire voting or equity rights in Anthem Insurance. Of particular importance, the court credited testimony by Blue Cross' primary outside counsel, John E. Kreitler, and Anthem Insurance's primary outside counsel, Tibor D. Klopfer, that the two attorneys frequently discussed the membership issue prior to the merger. They agreed that employers such as the state that held Blue Cross group policies would be treated as "grandfathered groups" after the merger and that such a group would be treated as the mutual member of Anthem Insurance *with respect to all of the policies that it held, including new group policies purchased after the merger*. Membership rights for grandfathered groups and new groups that obtained Blue Cross policies after the merger would thus be mutually exclusive, so that a grandfathered group and its employees could not simultaneously hold membership rights in the merged entity. Put differently, the attorneys both understood that § 7.6 (c) of the 1997 articles would apply only to policies obtained by *customers* who were new to New CT-Blue after the merger.

Second, the court considered public statements that Blue Cross and Anthem Insurance made to the Connecticut Insurance Department and the Indiana Department of Insurance in connection with the regulatory approval process. In Connecticut, the two insurers filed a "Form A: Joint Statement Regarding the Proposed Merger of [Blue Cross] with and into [Anthem Insurance], and the Resulting Acquisitions of Anthem Health Plans, Inc.,

and Connecticut American, Incorporated" (Form A). In that form and related discussions with the Connecticut Insurance Department that took place between November, 1996, and March, 1997, representatives of the two companies reiterated their view that grandfathered groups would hold membership in the merged entity consistent with Blue Cross' premerger membership rules and that only certificate holders in *groups* that first enrolled with New CT-Blue after the merger would be entitled to membership rights. Kreitler, for example, expressed his views about the membership issue in a November 21, 1996 letter to the Connecticut Insurance Department. Cynthia S. Miller, Anthem Insurance's vice president and chief actuary, expressed similar sentiments in public hearings before the Indiana Department of Insurance in June, 1997.

Third, the court considered a report that was attached as an exhibit to Form A. The Report of Milliman & Robertson, Inc., and Statement of Opinion of Dale Hagstrom (fairness opinion) was written by Dale S. Hagstrom, a consulting actuary retained by Blue Cross to, among other things, (1) determine the postmerger rights of policyholders in the event of an Anthem Insurance demutualization, and (2) opine as to whether the merger would be fair to Blue Cross members. Following his review of the merger documents and discussions with Miller, Kreitler, Klopfer, and other attorneys involved in the merger, Hagstrom concluded that it was the expressed intent of the parties that grandfathered Blue Cross groups would continue to be the members of the merged entity, *even with respect to new policies issued after the merger*. He further opined that, according to the parties, it was "inconceivable" that both a grandfathered group such as the state and some of its enrollees could simultaneously be members of Anthem Insurance.

Fourth, the court considered two notices—an information circular and a special meeting notice—that were sent to Blue Cross members prior to their vote to approve the merger. Those documents informed members that the Blue Cross membership rules would continue to apply to them under the merged entity and that their proprietary interests would be preserved in the form of equivalent interests in Anthem Insurance. They further explained that individual holders of certificates of benefits issued under Blue Cross group policies did not have membership proprietary rights.[24] With due regard to this background, we turn our attention to the plaintiffs' arguments.

1

## Reliance on Testimony

We first consider the plaintiffs' contention that it was improper for the court to rely on the testimony of witnesses such as Kreitler and Klopfer. The plaintiffs draw

our attention to the well established rule that "the intent relevant in contract matters is not the parties' subjective intents but their outward manifestation of it. . . . The cardinal rule of contract interpretation is to ascertain the intention of the parties from their expression of it. The court does not examine the hidden intentions secreted in the heart of a person but, rather, examines the final expression found in conduct." (Citation omitted.) *Real Estate Support Services, Inc.* v. *Nauman*, 644 N.E.2d 907, 910–11 (Ind. App. 1994). The plaintiffs concede, as they must, that the intentions of Kreitler and Klopfer with respect to the membership issue did not remain hidden or secret. The court credited testimony that the attorneys discussed the matter with each other while negotiating the merger agreements, and later with Hagstrom and others. Nevertheless, the plaintiffs contend that the trial court could not consider extrinsic evidence of the attorneys' intent because that intent was never expressed to future members of Anthem Insurance—in this case, either the state or the plaintiffs.

There are several flaws in this argument. First, although it may be technically correct that, under Indiana law, the Anthem Insurance members were parties to the merger agreement and associated covenants, the plaintiffs have cited no authority for the proposition that a court may not consider extrinsic evidence of the intent behind a corporate agreement unless that intent was expressed to all of the corporation's members or shareholders when the contract was negotiated and executed. Rather, we think it likely that Indiana courts would conclude that statements made by an attorney working on behalf of a corporation and at the direction of its officers are relevant, even if not dispositive, evidence of the meaning of ambiguous contractual provisions drafted by the attorney. See, e.g., *Dept. of Public Welfare* v. *Chair Lance Service, Inc.*, 523 N.E.2d 1373, 1377 (Ind. 1988) ("[t]he fundamental principles regarding the authority of an agent of a corporation are substantially the same as those applicable to agents generally"); see also *Phillips* v. *National Trappers Assn.*, 407 N.W.2d 609, 612 (Iowa App. 1987) (when articles of incorporation were ambiguous, trial court properly admitted testimony by drafter as to his intent); 18A Am. Jur. 2d 45, Corporations § 165 (2015) (when confronted with ambiguous articles of incorporation, court will consider history and surrounding circumstances to determine parties' intent). Nor have the plaintiffs cited to any authority suggesting that Indiana courts depart from the general rule that shareholders are charged with knowledge of the provisions of a corporate charter and are bound thereby. 18 Am. Jur. 2d 747, Corporations § 76 (2015); see also 18A Am. Jur. 2d, supra, § 633, p. 500 (shareholders may be bound by corporate actions even if taken without their knowledge or participation).

The second flaw in the plaintiffs' argument is that, even if the opinions of Kreitler and Klopfer were not expressed directly to members of Blue Cross, those opinions were made public via the regulatory approval process to which the merger was subject. It is noteworthy in this respect that the information circular and special meeting notice, both of which were sent to all Blue Cross members prior to their approval of the merger, each contained a section entitled "[r]egulatory and [o]ther [a]pprovals." Those sections informed members that the merger would be subject to regulatory approval, that the two merging companies had filed a Form A with the Connecticut Insurance Commissioner (commissioner), and that the commissioner would be conducting public hearings regarding the merger. Accordingly, at least the state, if not the plaintiffs, may be charged with constructive knowledge of the contents of Form A and of the statements of intent that the parties' representatives made to Connecticut and Indiana regulators.

The third flaw in the plaintiffs' argument is that, regardless of what notice persons who were Blue Cross members as of early 1997 were entitled to receive, it is undisputed that the plaintiffs were not members of either Blue Cross or Anthem Insurance at the time the 1997 articles were drafted and the merger was consummated. The state was the Blue Cross member at that time, and the plaintiffs were at best potential future members of Anthem Insurance. In that respect, they were more akin to potential third-party beneficiaries of the 1997 articles than parties to that agreement. Under Indiana's "stranger to the contract" rule, however, "the inadmissibility of parol evidence to vary the terms of a written instrument does not apply to a controversy between a third party and one of the parties to the instrument." (Internal quotation marks omitted.) *Amici Resources*, *LLC* v. *Alan D. Nelson Living Trust*, 49 N.E.3d 1046, 1050 (Ind. App. 2016). Thus, the plaintiffs cannot be heard to complain that the trial court considered extrinsic evidence that was not disclosed to them. For all of these reasons, we conclude that it was not improper for the trial court to consider the testimony of Kreitler and Klopfer as to the meaning of the merger documents.

2

Evidence of the Parties' Intent Expressed

After the Adoption of the 1997 Articles

We next consider the plaintiffs' argument that the trial court improperly admitted evidence of the parties' intent that was expressed after the adoption of the 1997 articles in April, 1997. The plaintiffs maintain, for example, that the court should not have considered testimony regarding statements that Miller made before the Connecticut Insurance Department, because that

testimony was not given until June, 1997.

We already have explained why the trial court correctly concluded that the 1997 articles were part and parcel of the other merger documents. See part II A of this opinion. For that reason, statements that the parties made in the context of drafting those documents or obtaining approval of the merger are not irrelevant to the present dispute. More generally, however, we disagree with the plaintiffs that, under Indiana law, the only intent that is relevant to the interpretation of an ambiguous contract is that which existed at the time of contracting. Rather, Indiana follows the general rule that the parties' course of conduct after forming a contract may provide extrinsic evidence of the meaning of ambiguous terms. See, e.g., *Bank of America, N.A.* v. *Ping*, 879 N.E.2d 665, 671 (Ind. App. 2008); *Noble Roman's, Inc.* v. *Pizza Boxes, Inc.*, 835 N.E.2d 1094, 1099–1100 (Ind. App. 2005). We do not believe that it was irrelevant that the parties to the merger continued to express before regulatory agencies charged with approving the merger the very same sentiments that they had expressed privately to each other at the time they drafted the merger documents. In any event, any possible error in this respect was harmless because Miller's testimony was merely cumulative of other evidence properly considered by the trial court. See *King* v. *State*, 460 N.E.2d 947, 950 (Ind. 1984).

### 3

### Rule of Contra Proferentem

Finally, we consider the plaintiffs' argument that, because it was Anthem Insurance—in consultation with Blue Cross—rather than the plaintiffs who drafted the 1997 articles and other merger documents, any ambiguities in those documents should be construed against Anthem Insurance according to the rule of contra proferentem. The plaintiffs further contend that the rule applies with particular force in the present case because they played no part in negotiating or drafting the documents and the merger documents thus represent a contract of adhesion with respect to them.

As we already discussed, under Indiana law, an ambiguous contract is construed against the drafter only as a last resort, after all other indicia of the parties' intent have been consulted. In the present case, the trial court properly consulted extrinsic evidence and concluded that it unequivocally supported the defendants' interpretation of the merger documents. Accordingly, there was no reason for the court to apply the rule of contra proferentem.

We further note that the plaintiffs' argument that the 1997 articles were a contract of adhesion with respect to them and should be construed in their favor because they were not involved in drafting it would presumably apply with equal force to any purported third-party ben-

eficiary to a contract. It would be a perverse rule indeed, however, if any person claiming to be the intended beneficiary of an ambiguous contract to which he was not a party were automatically entitled to have the contract construed in his favor precisely because he had played no part in its drafting. Indiana wisely follows a different approach. See, e.g., *St. Paul Fire & Marine Ins. Co.* v. *Schilli Transportation Services, Inc.*, 672 F.3d 451, 456 (7th Cir. 2012) (court is not required to construe ambiguous contract against drafter in favor of nonparty).

We thus conclude that the trial court properly considered extrinsic evidence of the parties' intent and correctly construed the relevant contract language. Accordingly, the trial court properly found in favor of the insurance company defendants.

The judgment is affirmed.

In this opinion the other justices concurred.

[*] This appeal originally was argued before a panel of this court consisting of Justices Palmer, Zarella, Eveleigh, McDonald, and Robinson. Thereafter, Justice Zarella retired from the court, and Justice Espinosa was added to the panel. Justice Espinosa has read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

[1] As an alternative ground for affirmance, Anthem Insurance, among other defendants, contends that the trial court properly rendered judgment in its favor on a second, independent basis. Specifically, the court (1) determined that a provision in Anthem Insurance's 2001 plan of conversion created a presumption that Anthem Insurance's membership determinations were correct for the purpose of demutualization if the decisions were based on Anthem Insurance's records and were made in good faith, and (2) found that both of those conditions were satisfied with respect to Anthem Insurance's distribution of the plaintiffs' alleged membership interests to the state. The plaintiffs challenge both the trial court's legal conclusions and its factual findings. Although our conclusion that the court properly construed the relevant contract language means that we need not address the alternative ground for affirmance, we note that we have considered the plaintiffs' arguments in this respect and find them to be without merit.

[2] We refer collectively to the agreement to merge, the plan and joint agreement of merger, the 1997 articles, and the guaranty policy as the merger documents.

[3] The trial court also considered the relevance of a third policy, denominated HUSKY, which the Department of Social Services obtained from Blue Cross beginning in 1995.

[4] "Mutual insurance companies are owned by their members, who are also insureds. . . . Stock insurance companies are owned by stockholders." (Citation omitted.) *Gold* v. *Rowland*, supra, 296 Conn. 192 n.7.

After Indiana's insurance commissioner approved the plan of conversion with an effective date of November 2, 2001, Anthem, Inc., was organized as a stock corporation under Indiana law to be the parent corporation of Anthem Insurance.

[5] We hereinafter refer to Anthem, Inc., New CT-Blue, Anthem East, Inc., and Anthem Insurance collectively as the insurance company defendants. Equiserve Trust Company, N.A. (Equiserve), also was named as a defendant. Equiserve is not a party to this appeal.

[6] The fourth amended complaint alleged only the misdelivery of the Anthem, Inc. stock, conversion of property, and breach of contract. Only the breach of contract claim remains at issue.

[7] At a prior stage of the proceedings, Judge Sheldon likewise concluded that the relevant contract language was ambiguous. See *Gold* v. *Rowland*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-02-0813759-S (January 10, 2005).

[8] Although Indiana law governs the substantive issues in this appeal, the parties appear to agree that our standard of review is established by Connecticut law. See *Montoya* v. *Montoya*, 280 Conn. 605, 613–14 and n.8, 909 A.2d

947 (2006). In any event, we do not believe that the standard of review would be materially different under Indiana law. See, e.g., *Deel* v. *Deel*, 909 N.E.2d 1028, 1034 (Ind. App. 2009).

[9] Indiana courts traditionally recognized a distinction between patent ambiguities, which are apparent on the face of a contractual instrument and arise by reason of an inconsistency or inherent uncertainty of language, and latent ambiguities, which arise when the wording of an agreement is facially clear and intelligible but gives rise to an ambiguity as applied to a particular set of circumstances. See, e.g., *Hauck* v. *Second National Bank*, 153 Ind. App. 245, 261–62, 286 N.E.2d 852 (1972). The traditional rule was that extrinsic evidence is admissible to explain or clear up a latent ambiguity but is not admissible to explain or remove a patent ambiguity; id.; which the court must resolve as a matter of law. See *Simon Property Group*, *L.P.* v. *Michigan Sporting Goods Distributors*, *Inc.*, 837 N.E.2d 1058, 1071 (Ind. App. 2005), transfer denied, 855 N.E.2d 1003 (Ind. 2006). In 2006, however, the Indiana Supreme Court abandoned this distinction between patent and latent ambiguities, concluding that "it is proper to admit extrinsic evidence to resolve any ambiguity." (Internal quotation marks omitted.) *Tender Loving Care Management, Inc.* v. *Sherls*, 14 N.E.3d 67, 72 n.1 (Ind. App. 2014), quoting *University of Southern Indiana Foundation* v. *Baker*, 843 N.E.2d 528, 535 (Ind. 2006).

[10] Because we conclude that the 1997 articles and the other merger documents are components of a single agreement and are ambiguous when read together, we need not determine whether the 1997 articles, standing alone, are ambiguous with respect to the membership and demutualization issue.

[11] The plan and joint agreement of merger refers to the 1997 articles at recital C and §§ 1.2, 4.1, and 5.2. Article IV of the group policy provides that Blue Cross members will retain their interests in Blue Cross prior to the merger "[a]s provided in [Anthem Insurance's] [a]rticles of [i]ncorporation . . . ."

[12] Article VII of the group guaranty policy issued to Blue Cross group policyholders at the time of the merger also includes an integration clause. As we noted, that document also was attached as an exhibit to the agreement to merge and thus incorporated therein.

[13] The record does not indicate the date on which the members of Anthem Insurance voted to approve the merger.

[14] Article IX of the agreement to merge mandates that members of both Anthem Insurance and Blue Cross convene to approve the merger. Section 9.1 requires that Anthem Insurance convene a meeting as promptly as practicable to vote on the merger and the amended articles of incorporation, and § 9.2 requires that Anthem Insurance's members vote on the plan and joint agreement of merger. Section 9.3 provides that, following favorable votes by the members of both Anthem Insurance and Blue Cross, the proper officers of those companies shall proceed to execute the merger.

Section 10.1 also makes clear that approval of both the agreement to merge and the plan and joint agreement of merger by Anthem Insurance members was a condition precedent to the consummation of the merger. Section 13.1 further provides that the agreement to merge could be terminated in the event that the membership of either merging company failed to approve the merger. In addition, §§ 6.17 and 8.9 of the agreement refer to a vote by Anthem Insurance's membership.

[15] To the extent that the plaintiffs contend that it was improper to consider whether the merger documents and the 1997 articles were part and parcel of the merger because the merger documents constitute extrinsic evidence vis-a-vis the 1997 articles, the plaintiffs beg the question. If, as we have concluded, those documents were part and parcel of the same transaction, then, by definition, they do not constitute *extrinsic* evidence.

[16] Section 3.1 of the plan and joint agreement of merger contains substantially similar language. Section 5.2 of that document further provides that "each holder of a certificate of coverage under a group New CT-Blue insurance policy or healthcare benefit contract originally issued after the [e]ffective [t]ime shall be entitled to receive an Anthem [Insurance] certificate of membership issued under an Anthem [Insurance] group guaranty insurance policy."

[17] The plaintiffs do not dispute, however, that the state also remained a member of Anthem Insurance because it continuously held qualified policies—first, Care Plus, and then the 1999 group policy that ultimately replaced Care Plus—from the time of the merger until the demutualization.

[18] In their briefs, the plaintiffs repeatedly emphasize that the 1997 articles and other merger documents speak in terms of "members" and "policyhold-

ers" but generally do not use terms such as "customers" and "grandfathered groups." They argue that the trial court improperly adopted the insurance company defendants' use of such terminology, which, in their view, gives the false impression that the merger documents distinguish between premerger Blue Cross *customers* and new, postmerger customers. The plaintiffs instead read the documents to distinguish only between premerger and postmerger *policies*. Although, at times, we use the term "customer" for convenience or to explain the insurance company defendants' theory of the case, we reach our ultimate conclusion—that both parties have articulated a plausible reading of the merger documents—fully cognizant of the fact that the relevant contractual provisions do not use such terminology.

[19] As the insurance company defendants note, the 1999 group policy did not necessarily need to be added to the schedule in order for the relevant provisions of guaranty policy to apply to it. The guaranty policy defines the "Anthem [Blue Cross] Contract" to include not only the contract identified on the attached schedule, but also "any renewal or amendment, or any replacement thereof . . . ." Because the 1999 group policy replaced Care Plus without lapse, the guaranty policy presumably remained in effect at the time of demutualization.

[20] It is true, as the plaintiffs note, that § 4.1 of the agreement to merge extends the membership rights provided by § 3.4 to individual certificate holders under New CT-Blue group policies issued after the merger. It does so, however, only "to the extent applicable," and only to individuals who also hold an Anthem Insurance "insurance policy or membership certificate that guarantees [those] benefits . . . ." There is no indication, however, that the plaintiffs ever received certificates that would entitle them to such benefits, and the extent to which § 4.1 is applicable to them is, of course, the question we must resolve.

The same can be said of § 8.6 (c) of the agreement to merge, on which the plaintiffs also rely. Although that provision indicates that individual holders of certificates of coverage under new postmerger group policies are entitled to receive certificates of membership, it also states that "[n]othing contained in this [s]ection . . . shall affect or alter in any manner the obligations of the parties under [a]rticle III."

[21] The plaintiffs contend that § 8.6 of the 1997 articles is inapplicable because Anthem Insurance issued only one group policy to the state. Notably, however, the plaintiffs themselves are equivocal on this point. In their principal appellate brief, they contend that Anthem Insurance issued only the 1999 group policy. In their reply brief, by contrast, they contend that Anthem Insurance issued only the guaranty policy, and that it was the Anthem Insurance subsidiary New CT-Blue that issued the 1999 group policy. Drawing a distinction between policies issued by Anthem Insurance and its subsidiary makes little sense, however. Section 8.6 is clearly addressed to the types of health care benefits contracts that would be issued by New CT-Blue—those that are subject to regular renewal, amendment, or replacement—and, indeed, § 8.6 proceeds to discuss the specific case of a "member holding a [q]ualified [m]embership [s]ubsidiary insurance policy or health care benefits contract . . . ."

[22] Although the plaintiffs are correct that, as a general rule, all words in a contract must be given meaning; see, e.g., *Magee* v. *Garry-Magee*, 833 N.E.2d 1083, 1088 (Ind. App. 2005); the trial court correctly observed that Indiana courts have at times departed from this rule in concluding that certain phrasing is mere surplusage. See, e.g., *Irwin* v. *Kilburn*, 104 Ind. 113, 116–17, 3 N.E. 650 (1885).

[23] The parties also disagree with respect to their interpretation of various provisions of the merger documents that seek to ensure that Blue Cross members such as the state will recoup their full interests in the merged entity upon demutualization. The record before us is insufficient to evaluate these arguments.

[24] Although the trial court found that the plaintiffs each held certificates of coverage under the 1999 group policy, there is no indication in the record that the plaintiffs ever received guaranty policies, certificates of membership, or other documents indicating that they were granted membership in Anthem Insurance by virtue of their participation in the 1999 group policy, or that they ever paid membership fees to Anthem Insurance or exercised or sought to exercise voting rights or other privileges of membership.