******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# MICHELE MORTON *v.* NEIL SYRIAC
## (AC 40608)

Alvord, Elgo and Devlin, Js.

*Syllabus*

The plaintiff sought a temporary and permanent injunction to, inter alia, prevent the defendant, her former husband, from limiting her access to a shared driveway, and for other relief. Pursuant to a separation agreement that was incorporated into the parties' dissolution judgment, the defendant quitclaimed his ownership interest in certain real property to the plaintiff, including an area known as the east branch. He provided an express easement that allowed the plaintiff to reach her quitclaimed property with access over the shared driveway on the property that he retained, known as the west branch, until he installed a similar driveway for her to use on the east branch. The plaintiff's property is landlocked without access to a right-of-way over either the east branch or the west branch. The plaintiff's and the defendant's properties lie northerly of and abut a portion of a discontinued highway known as the Old Connecticut Path. The defendant repeatedly obstructed the plaintiff's access to the quitclaimed property by various means, including placing objects, such as boulders and a gate, across the shared driveway. The trial court rendered judgment in favor of the plaintiff, granting her a permanent injunction, from which the defendant appealed to this court. Thereafter, the trial court denied the defendant's motions to open and to disqualify. *Held*:

1. The defendant could not prevail on his claim that the trial court wrongly issued a permanent injunction:

   a. Although, as the defendant claimed, the plaintiff did not allege irreparable harm or lack of an adequate remedy at law, the complaint provided adequate notice of the plaintiff's claim for a permanent injunction: the plaintiff explicitly sought a permanent injunction in her prayer for relief and clearly alleged that the defendant had consistently impeded her ability to use the shared driveway to access her property; moreover, the complaint further explained that the plaintiff asserted her right to use the shared driveway on the basis of the parties' separation agreement, providing the defendant with sufficient notice of the factual basis of the plaintiff's claims, the defendant's claim having been premised on a legal technicality, rather than a claim of prejudice or lack of notice.

   b. Although the defendant claims that, during the course of the trial, the plaintiff did not establish that, without a permanent injunction, she would suffer irreparable harm and lacked an adequate remedy at law, the trial court correctly determined that a permanent injunction was warranted: the plaintiff sustained her burden of proving that the defendant had yet to install a similar driveway on the east branch as required by the separation agreement, and, although the defendant installed a serviceable means of allowing vehicular passage, the plaintiff does not yet and may never possess any marketable title that would allow the installation of a driveway on the east branch; moreover, there is a substantial likelihood that, in the absence of judicial intervention, the plaintiff stands to lose a valuable asset in the form of the quitclaimed property, which the defendant is uniquely poised to reacquire at a fire-sale price.

2. The defendant could not prevail on his claim that the trial court improperly allowed the plaintiff to modify the dissolution judgment by granting an injunction: as the defendant has not complied with the terms of the separation agreement because he has not installed a similar driveway as required in that agreement, the trial court effectuated, rather than modified, the terms of the separation agreement by determining that the plaintiff continues to have a right to access her property by crossing the defendant's property until the defendant satisfies his obligations under the separation agreement.

3. The defendant could not prevail on his claim that the trial court erred by allowing the plaintiff to present evidence that allegedly contradicted judicial admissions in her pleadings: although the defendant claimed

that the plaintiff admitted in her pleadings that she had fee title to the east branch and that the defendant had complied with the separation agreement, the plaintiff's admission of fee simple ownership of the east branch has no bearing on the marketability of her property, and the plaintiff's admission that a driveway was constructed by the defendant was not conclusive of whether that driveway was "similar" to the defendant's driveway as required by the terms of the separation agreement and, therefore, those admissions were not dispositive of the marketability of the property or the similar characteristics of the driveway constructed on the east branch.

4. The trial court did not abuse its discretion by denying the defendant's motion to disqualify the trial judge nor did it err in denying the defendant a hearing before another judge: although the defendant alleged that the trial judge that ruled on the injunction should have been disqualified because that judge presided at the defendant's sentencing in his criminal trial on a charge of breaking into the plaintiff's residence and because the plaintiff's trial counsel worked as the deputy chief clerk at the same courthouse that the trial judge was assigned to in 2011, the defendant, claiming to be unaware of either of the alleged disqualifying factors until after judgment was rendered, waived his claim that the trial judge should be disqualified on the basis of his connection to the defendant's criminal trial, as the defendant had cause to know of his own prior interactions with the trial judge and consented to whatever impropriety, if any, existed as a result of those interactions, and, regarding the plaintiff's trial counsel, the only evidence offered in support of defendant's motion was that, for a very brief window of time, the trial judge and the plaintiff's trial counsel worked in the same building, any interaction between the trial judge and the plaintiff's trial counsel occurred more than six years before the trial court case was decided, the defendant did not offer any further evidence to support his claim that the trial judge's impartiality was compromised by a suspected single interaction between the trial judge and the plaintiff's trial counsel, and the plaintiff's trial counsel worked as the deputy chief clerk for civil matters whereas the trial judge had been assigned to a criminal trial in the same courthouse; moreover, the trial court did not err in denying the defendant a hearing before another judge on the motion to disqualify regarding the allegations concerning the plaintiff's counsel because, in the absence of further allegations to substantiate the defendant's claim, there was no fair support to his claim that would have entitled him to a hearing.

Argued November 13, 2019—officially released March 3, 2020

*Procedural History*

Action seeking a temporary and permanent injunction to, inter alia, prevent the defendant from limiting the plaintiff's access to a shared driveway, and for other relief, brought to the Superior Court in the judicial district of Windham, and tried to the court, *Boland, J.*; judgment for the plaintiff, from which the defendant appealed to this court; thereafter, the court, *Cole-Chu, J.*, denied the defendant's motions to open and to disqualify. *Affirmed.*

*Brian S. Mead*, for the appellant (defendant).

*Michael D. O'Connell*, with whom, on the brief, was *Stan Michael D. Maslona*, for the appellee (plaintiff).

*Opinion*

DEVLIN, J. The defendant, Neil Syriac, appeals from the judgment of the trial court granting a permanent injunction enjoining him from obstructing the use of a shared driveway that runs across the defendant's property by the plaintiff, Michele Morton, who is his former wife. The defendant asserts that the trial court erred by (1) issuing a permanent injunction when the plaintiff neither alleged nor proved that she would suffer irreparable harm and that she lacked an adequate remedy at law, (2) modifying the separation agreement previously stipulated to by the parties and incorporated into an earlier judgment of dissolution, (3) allowing the plaintiff to introduce evidence that contradicted judicial admissions contained in her complaint, and (4) denying his motion to disqualify the trial judge without a hearing. We affirm the judgment of the trial court.

The following facts and procedural history are relevant. This appeal arises from a property dispute originating with the April 13, 2010 dissolution of the parties' marriage. At that time, the parties entered into a separation agreement, incorporated into the dissolution judgment, that in relevant part divided between the parties two parcels of land located in Woodstock. The separation agreement provided that the defendant would quitclaim his ownership interest in 95 Rocky Hill Road to the plaintiff and the defendant would retain sole interest in 97 Rocky Hill Road. The separation agreement further provided that "[t]he defendant agrees to allow the plaintiff and or her agents access to the property located at 95 Rocky Hill Road, Woodstock . . . through 97 Rocky Hill Road, until . . . [the defendant], at his sole expense, install[s] a driveway *similar* to the driveway presently at use at 97 Rocky Hill Road, from the property located at 95 Rocky Hill Road to [Route] 171 in Woodstock . . . ." (Emphasis added.) The subsequent quitclaim deed that transferred ownership of 95 Rocky Hill Road to the plaintiff provided an express easement that conveyed "the right with others to pass and repass by foot and/or vehicle, and to install and maintain utilities, over and across that portion of the premises now or formerly of [the defendant] known or formerly known as 'Old Connecticut Path' from the herein described tract [95 Rocky Hill Road] westerly to Rocky Hill Road."

The trial court in the present action, *Boland, J.,* described the properties as follows: "[95 Rocky Hill Road's] westerly boundary is entirely coextensive with a portion of the easterly boundary of [the] defendant's tract . . . . Both these tracts lie northerly of and abut upon a portion of a discontinued highway called the Old Connecticut Path, or OCP.

"The nearest public highway to the west of the two parcels is a town road named Rocky Hill Road. Rocky Hill Road runs northerly and westerly from State Route

171. Route 171, which runs generally in a north-south direction, is the nearest public highway to the east. The OCP connects these two thoroughfares, and if all three roads ran perfectly straight they would form the shape of a triangle.

"The plaintiff's property consists of about an acre of land lying almost dead center on the portion of the OCP connecting the two public roads. Absent a right-of-way either to the east or the west over the OCP, her piece is landlocked. The defendant's property is much larger, and in parts lies north, west, and south of the OCP. Similarly, his only access to a public highway is via the OCP. To the west of his land, and to the east of the plaintiff's, lie lands belonging to abutters who are not parties to this action.

"The defendant holds title to the stretch of the OCP leading in the westerly direction (the west branch), and that part of the path enables him to access Rocky Hill Road. The plaintiff has a claim to ownership of the portion of the path which leads to Route 171 on the east (the east branch), but present or former abutters also possess claims to that strip adverse to hers." (Internal quotation marks omitted.)

On August 10, 2015, the plaintiff filed a verified complaint seeking a "permanent injunction ordering the defendant to refrain [from] engaging in any action or omission thereto including building, erecting, constructing or allowing to be built any structures, temporary or permanent, within the easement area that would in any way limit or impede foot and/or vehicle access to 95 Rocky Hill Road from the Rocky Hill Road entrance or circumvent or hamper the plaintiff's use and enjoyment of the easement." In her complaint, the plaintiff alleged that the defendant has repeatedly obstructed her access to 95 Rocky Hill Road through various means, including placing hay baling equipment, boulders, wire fencing, and a black metal gate across the shared driveway that runs across 97 Rocky Hill Road. The plaintiff further alleged that she has previously obtained a post-judgment order from the family court instructing the defendant to cease his obstruction of the easement. In response, the defendant alleged that, per the terms of the separation agreement, he has provided the plaintiff a "similar" driveway across the east branch and, thus, the plaintiff no longer has a right to cross the west branch.

On June 9, 2017, following a trial to the court, the court issued a memorandum of decision granting a permanent injunction. The court's judgment was based on the following findings of fact regarding the ownership of the two parcels of land at issue. "First, it was in 1922 that the town of Woodstock discontinued all public use of the [OCP]. Upon that event, any public easement encumbering the path was extinguished. In 1922, one William Buell owned all the land along both sides of the path between Rocky Hill Road and Route 171. At

later times in the mid-twentieth century, William Buell or his heirs subdivided that large parcel. . . . [T]hey conveyed the easterly half to the predecessors in interest of [Jon] Grosjean, [Karen] Christie, and [Karen] Roy. Along with those conveyances went such title as Buell had to the east branch of the OCP. Separately, and at a later date . . . the westerly half of [Buell's] holdings, approximately 34.4 acres in size . . . were acquired by [the] defendant's father, Cyrille Syriac. As a result of these various transfers, Cyrille Syriac owned both the fee simple and all rights of usage to the western branch of the path.

"Conveyances in Cyrille Syriac's chain at times included a clause transferring to him 'any interest the grantor may have in and to that section of the [OCP] running from Rocky Hill Road easterly for about 1500 feet,' that is, to the entire stretch of the path between the two public roads. . . .

"Eventually, in 1984, Cyrille Syriac conveyed his interest in the parcels to [the defendant]. As in the prior deeds of which he was the grantee, Cyrille attempted to provide that [the defendant] would also enjoy the right to use the entirety of the OCP by tendering him his 34.4 acres '[t]ogether with any interest the grantor may have in and to that section of the [OCP] running from Rocky Hill Road easterly for about 1500 feet.' . . .

"Next in the chain of title is a quitclaim deed dated December 31, 1986, by which [the defendant] conveyed to his brother, Eric, a tract about one acre in size. This is the parcel upon which stands the house now known as [95 Rocky Hill Road], and is the same tract the 2010 separation agreement and family court decree awarded to [the] plaintiff; the deed alludes to it as 'Tract A.' In addition to Tract A, the deed grants as 'Tract B' the east branch of the OCP, employing a newly devised metes and bounds description prepared from a survey [the defendant] had obtained sometime between 1984 and 1986. . . .

"The map depicts an inhibiting, triangular wedge of the path as belonging to Anna Petrone, an abutting predecessor in interest to Karen Roy; the Petrone piece alone cuts by half the usable width of so-called Tract B. On June 10, 1987, [the defendant] delivered to his brother an instrument captioned 'Grant of Easement' conveying to Eric a right-of-way over the west branch . . . which [the defendant] today opposes when demanded by [the plaintiff].

"No evidence was offered as to whether Petrone or Roy has had any interaction with the plaintiff or with either Syriac brother. However, in December of 1987, abutter [Jon] Grosjean declared an overt challenge to Eric's claim to ownership of or right to use the east branch. Grosjean wrote to Woodstock's first selectman asserting his own interest in the path and objecting to

Eric's making use of it. The controversy over the east branch did not abate, for in 1993 an attorney for Grosjean wrote directly to Eric Syriac challenging his erection of a fence at the Route 171 intersection of the path and threatening legal action to contest any claim that title to the path belonged to [Eric]. After that time, there is no evidence that Eric again used the east branch, but it is clear that the west branch became his primary if not exclusive means of access to [95 Rocky Hill Road].

"On May 11, 2005, via a survivorship warranty deed, Eric reconveyed all his interest in these various pieces to [the defendant] and the plaintiff, including the easement he obtained in 1987. Eric's deed to them also includes the vague reference to the right to use the OCP 'SUBJECT to the rights of others,' as exists in Cyrille's 1984 deed but which was absent from [the defendant's] 1986 deed. As to the east branch, Eric granted Tract B merely by adding to the house lot 'any rights the Mortgagor . . . may have in and to a certain parcel of land running easterly from the above described premises to . . . Route 171, formerly known as [the OCP].' . . .

"When [the defendant] conveyed his interest in that tract to [the plaintiff] on April 13, 2010, his deed again described two tracts as had the earlier instruments, and also included the right of access over the west branch." (Footnote omitted.)

On the basis of these findings of fact, the court concluded that the plaintiff did not possess marketable title to the east branch of the OCP. Accordingly, the court determined that the defendant has not yet provided a driveway that is "similar" to the current shared driveway to allow the plaintiff access to Route 171 across the east branch of the OCP. The court thereafter concluded that the defendant did not fully comply with the separation agreement and issued a permanent injunction, enjoining the defendant from impeding the plaintiff's use of the westerly easement across 97 Rocky Hill Road. This appeal followed.

I

The defendant first claims that the court wrongly issued a permanent injunction because the plaintiff had neither alleged nor proven irreparable harm and a lack of an adequate remedy at law. We disagree.

We begin by setting forth the relevant standard of review. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion . . . the trial court's decision must stand." (Internal quotation marks omitted.) *Commis-*

*sioner of Correction* v. *Coleman*, 303 Conn. 800, 810, 38 A.3d 84 (2012), cert. denied sub nom. *Coleman* v. *Arnone*, 568 U.S. 1235, 133 S. Ct. 1593, 185 L. Ed. 2d 589 (2013). "How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Internal quotation marks omitted.) *New Breed Logistics, Inc.* v. *CT INDY NH TT, LLC*, 129 Conn. App. 563, 571, 19 A.3d 1275 (2011).

A

We first address whether the plaintiff properly pleaded the requisite allegations of irreparable harm and lack of an adequate remedy at law necessary to warrant a permanent injunction. "[P]arties are bound by their pleadings. . . . Construction of pleadings is a question of law. Our review of a trial court's interpretation of the pleadings therefore is plenary." (Citation omitted; internal quotation marks omitted.) Id., 573.

"The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . A complaint should fairly put the defendant on notice of the claims against him. . . . The modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery. . . . Whether a complaint gives sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which is to prevent surprise upon the defendant." (Internal quotation marks omitted.) *Prime Locations of CT, LLC* v. *Rocky Hill Development, LLC*, 167 Conn. App. 786, 802–803, 145 A.3d 317, cert. denied, 323 Conn. 935, 150 A.3d 686 (2016).

It is true, as the defendant argues, that the plaintiff never explicitly alleged in her complaint that she has suffered an irreparable harm or that she lacks an adequate remedy at law. There can, however, be no serious claim of surprise or prejudice by the defendant for the lack of these terms. Despite the absence of this precise language, the plaintiff explicitly sought a permanent injunction in her prayer for relief, and her complaint sufficiently gave the defendant notice of the basis upon which she sought an injunction. The plaintiff clearly alleged that the defendant has consistently, through a variety of means, impeded her ability to use the common driveway to access 95 Rocky Hill Road. The com-

plaint further explains that the plaintiff asserts her right to use that common driveway on the basis of the parties' separation agreement. Therefore, the defendant cannot claim that he did not have sufficient notice of the factual basis of the plaintiff's claims. Indeed, his claim is entirely premised on a legal technicality, rather than a claim of prejudice or lack of notice. We thus conclude that the complaint provided adequate notice of the plaintiff's claim for a permanent injunction.

B

We next address whether, during the course of the trial, the plaintiff established that, without a permanent injunction, she would suffer irreparable harm and lacked an adequate remedy at law.

The following additional facts and procedural history are relevant to this claim. As the court rightly summarized, the core "issue dividing the parties at present is . . . [i]f, as the defendant maintains, he has fulfilled the obligation he assumed [under the separation agreement] to build a driveway 'similar' to that which served both parcels historically, he is entitled to be free of the plaintiff's passage over the west branch. If he has not, as [the plaintiff] maintains, then by virtue of [the separation agreement] she has a continuing right to the use of that portion of the path until he does what he promised her he would do." Reflecting this dispute of terminology, the court, in its memorandum of decision, addressed in great depth the legal significance of the term "similar" as used in the separation agreement.

The court explained that "Webster's Third New International Dictionary defines 'similar' as '1: having characteristics in common . . . [or] 2: alike in substance or essentials . . . .' " The court further analyzed the word "similar," stating that it "is generally interpreted to mean that one thing has a resemblance in many respects, nearly corresponds, is somewhat alike, or has a general likeness to some other thing . . . . Certainly the word similar has no meaning so fixed that a court, reading the contract in the light of its subject matter and the surrounding circumstances, may not give to the phrase such reasonable construction as will fairly effectuate the intent of the parties. *Leo Foundation, Inc.* v. *Kiernan*, 5 Conn. Cir. 11, 15–16, 240 A.2d 218 (1967)." (Citation omitted; internal quotation marks omitted.) The trial court noted that "[t]his observation comports well with the black letter rule that 'a contract is considered as a whole so as to give effect to all its provisions without narrowly concentrating [on] some clause or language taken out of context.' *Gold* v. *Rowland*, 325 Conn. 146, 160, 156 A.3d 477 (2017)."

Thereafter, the court analyzed the various characteristics of the east branch to determine whether, as required by the separation agreement, a similar driveway existed on the east branch. First, the court

addressed the physical qualities of the east branch of the OCP. The court recognized that, prior to the filing of this action, the "defendant spent more than $10,000 in construction of the east branch. This investment produced a serviceable means of allowing vehicular passage between Route 171 and . . . 95 Rocky Hill Road." Although the plaintiff claimed that the east branch is steep, the court concluded that "[n]othing the defendant did adversely altered the topographical features of the landscape so as to create this grade, and her contract with him cannot fairly be read to require that he undertake a massive land moving project to accommodate her desires." The plaintiff also claimed that the east branch was overgrown with brush, but the court held that, under the terms of the separation agreement, it was the plaintiff's responsibility to maintain the east branch.

The court next analyzed the title history of the OCP to determine whether the plaintiff currently has marketable title to the east branch. Drawing on the testimony from the plaintiff's expert witness, Gerald Stefon, the court presented the following legal and factual analysis. At the time Cyrille Syriac acquired the west branch properties, "[a]ccording to Stefon . . . the grantors of [prior] instruments no longer possessed any transferrable rights to the east branch. Such rights as Buell earlier possessed had been conveyed away in the deeds he delivered to the east branch grantees. Stefon based this claim upon a rule of construction of deeds where highways are utilized as a bound, to the effect that when a highway forms such a bound, a conveyance 'to the highway' includes transfer of title to the center of the highway.

"The premise that a transfer of land bounded by a highway confers ownership to the middle thereof is well established in Connecticut law. Support for it appears as early as in the case of *Peck* v. *Smith*, 1 Conn. 103 [106] (1814), wherein . . . the court queried '[suppose] the lord of the manor should sell his land lying on the east side of the highway to A., bounding him on the highway west, and should sell the land lying on the west side of the highway to B., bounding him on the highway east. Has the lord of the manor any interest in the highway after this sale?' It answered that question in the negative, declaring that the purchasers on each side of the highway 'own each to the center of the road. . . .' *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, 142 Conn. 349, 355, [114 A.2d 216] (1955), is a modern case holding that '[a]n abutting owner is presumed under the law of this state, no evidence having been offered to the contrary, to own the fee of the land to the center of the highway.' The Appellate Court cited *Antenucci* in *Mierzejewski* v. *Laneri*, 130 Conn. App. 306, [309, 23 A.3d 82, cert. denied, 302 Conn. 932, 28 A.3d 344] (2011), an even more recent case holding that a deed describing a tract as bounded

'[s]outherly by [the] highway' conveyed to the center of that highway due to a 'common-law presumption that landowners whose property abuts a public highway own to the middle of the highway after the highway is discontinued or abandoned . . . .' Id., 318. The defendant offered no evidence to overcome that presumption, nor any evidence refuting Stefon's discussion of the various items in each of the chains of title he examined. Instead, he confined his response to a challenge to Stefon's resort to a rule of interpretation that has repeatedly and continuously been recognized by our appellate courts as a part of this state's real property jurisprudence."

The trial court thereafter explained that "[t]he legislature has enacted a bright line test for marketability in the form of General Statutes § 47-33c, which provides that only a 'person having the legal capacity to own land in this state, who has *an unbroken chain of title to any interest in land for forty years or more*, shall be deemed to have a marketable record title to that interest . . . .' (Emphasis added.) Because the root of the plaintiff's title is found in a 1986 intra-familial deed, she does not yet and may never possess any 'marketable' title to the eastern branch. At the time of his conveyance to her, [the defendant] was aware of the Grosjean and Petrone/Roy claims; [the plaintiff] was not. As a result of those claims, she is left with a house lot that has no marketable access route to the east. Indeed, even in 2011, Grosjean stated to the Woodstock Building Inspector that 'he did not give any permission for this road to be installed,' and that there had been 'much controversy on who owns this abandoned road.' In 2015, after she listed the property for sale and entered into a purchase and sale agreement containing a marketable title contingency clause, the buyer's attorney refused to issue a title insurance policy given the status of access over the east branch. In light of the land records and the circumstances known to [the defendant] when he transferred [95 Rocky Hill Road] to her, 'a real and substantial probability of litigation' over the east branch cannot be overlooked. . . .

"To construe the parties' use of the word 'similar' as constrained to the physical aspects of the two driveways, and not encompassing her ability to market her home, or, for that matter, to even get to it other than by helicopter, would deprive her of the benefit of a bargain she entered into in good faith. Absent legal access, the value of [95 Rocky Hill Road] obviously declines to near zero. As *Fellows* v. *Martin*, 217 Conn. 57, [65, 584 A.2d 458] (1991) informs us, 'equity abhors . . . a forfeiture,' and acceptance of the defendant's arguments here would yield just such an abhorrent result. Avoidance of such a result is an especially pertinent concern when the only likely beneficiary of her loss would be the defendant himself, positioned, as he is, to acquire her property rights for whatever she will take

and then provide [95 Rocky Hill Road] with necessary access over the west branch.

"[I]n light of all the foregoing, the plaintiff has sustained her burden of proving that the terms of the 2010 [separation] agreement and court order remain substantially unsatisfied. The intent expressed in those documents remains unfulfilled, and the family court's final order granting the plaintiff the right to continue to use the west branch remains fully appropriate."

Following this discussion, the court further concluded that "[t]here is undoubtedly substantial likelihood here that in the absence of judicial intervention the plaintiff stands to lose a valuable asset. To prevent that result requires a fairly minimum burden being placed upon the defendant, requiring that he not interfere with the use of her easement over the west branch. Hers is a single-family residence generating little traffic, over a path he himself already uses for his own home and must maintain whether or not the plaintiff shares in its use. The defendant tolerated the burden of use of that easement for over two decades, first by his brother and then by tenants occupying [95 Rocky Hill Road] between 2005 and 2010; only now that his ex-spouse demands the same right has he dug in his heels and said no. The court is also mindful both that he had superior knowledge of the potential roadblocks to use of the east branch when he negotiated that the plaintiff would use that route as her sole means of access, and that should she fail in achieving her goal here he is uniquely poised to take advantage of her predicament and reacquire possession of [95 Rocky Hill Road] at a fire-sale price."

Our examination of the record and briefs and our consideration of the arguments of the parties on this claim persuades us that the trial court correctly determined that a permanent injunction was warranted. Because the quoted portion of the court's memorandum of decision fully addresses the defendant's claim, we adopt it as the proper statement of the facts and applicable law on this issue. It would serve no useful purpose to repeat the discussion contained therein. See, e.g., *Woodruff* v. *Hemingway*, 297 Conn. 317, 321, 2 A.3d 857 (2010); *Samakaab* v. *Dept. of Social Services*, 178 Conn. App. 52, 54, 173 A.3d 1004 (2017).

II

The defendant next claims that the court improperly allowed the plaintiff to modify the separation agreement previously stipulated to by the parties and incorporated into the judgment of dissolution. The plaintiff, however, responds that the court was not modifying the judgment but, rather, was merely effectuating the separation agreement. We agree with the plaintiff.

"[O]ur courts have no inherent power to transfer property from one spouse to another in a marital disso-

lution proceeding. . . . Instead, that power rests upon an enabling statute, General Statutes § 46b-81 (a), which provides in relevant part: At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . . Critically, under § 46b-81 (a), the court does not retain continuing jurisdiction over any portion of the judgment that constitutes an assignment of property. . . . The court's authority to distribute the . . . property of the parties must be exercised, if at all, at the time that it renders judgment dissolving the marriage. Therefore, a property division order generally cannot be modified by the trial court after the dissolution decree is entered, subject only to being opened within four months from the date the judgment is rendered under General Statutes § 52-212a. . . .

"Although the court does not have the authority to modify a property assignment, a court, after distributing property . . . does have the authority to issue post-judgment orders effectuating its judgment. . . . This court has explained the difference between postjudgment orders that modify a judgment rather than effectuate it. A modification is [a] change; an alteration or amendment which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact. . . . In contrast, an order effectuating an existing judgment allows the court to protect the integrity of its original ruling by ensuring the parties' timely compliance therewith." (Citations omitted; internal quotation marks omitted.) *Richman* v. *Wallman*, 172 Conn. App. 616, 620–21, 161 A.3d 666 (2017).

In the present appeal, the defendant claims that the court modified the dissolution judgment because he, allegedly, has complied with the terms of the separation agreement and, thus, by granting an injunction, the court has modified the judgment to grant the plaintiff additional rights to the defendant's property. As we set forth in part I B of this opinion, however, the defendant has not, in fact, complied with the separation agreement. Instead, the court concluded, and we affirm, that he has yet to provide a similar driveway to the plaintiff. Thereafter, in accordance with the terms of the separation agreement, the court determined that the plaintiff continues to have a right to access her property by crossing the defendant's property until the defendant satisfies his obligations under the agreement. In essence, the court's entire analysis and rulings were necessary to effectuate the terms of the separation agreement; therefore, it did not modify the dissolution judgment.

### III

The defendant next claims that, in her pleadings, the plaintiff made multiple judicial admissions and the

court erred by not prohibiting her from presenting evidence that contradicted these admissions. Specifically, the defendant claims that the plaintiff admitted that she had "fee title" to the east branch of the OCP and that the defendant had complied with the separation agreement. We disagree.

"Normally, a court's determination of whether a particular statement made by a party in litigation is a judicial admission involves a factual determination. . . . In this case, however, the court's determination involved an interpretation of the pleadings. The interpretation of pleadings is always a question of law for the court. . . . In such a circumstance, our review is plenary. . . .

"Judicial admissions are voluntary and knowing concessions of fact by a party or a party's attorney occurring during judicial proceedings. . . . They excuse the other party from the necessity of presenting evidence on the fact admitted and are conclusive on the party making them. . . . Factual allegations contained in pleadings upon which the case is tried are considered judicial admissions and hence irrefutable as long as they remain in the case. . . . An admission in pleading dispenses with proof, and is equivalent to proof. . . . A party is bound by a judicial admission unless the court, in the exercise of a reasonable discretion, allows the admission to be withdrawn, explained or modified." (Citations omitted; internal quotation marks omitted.) *Mamudovski* v. *BIC Corp.*, 78 Conn. App. 715, 727–28, 829 A.2d 47 (2003), appeal dismissed, 271 Conn. 297, 857 A.2d 328 (2004).

Upon a careful reading of the defendant's brief, we can ascertain, at most, two admissions that the defendant claims were dispositive.[1] In her complaint, the plaintiff alleges that she "is the owner of fee title . . . to the property at 95 Rocky Hill Road . . . more particularly described in exhibit A." Exhibit A is a copy of the quitclaim deed that transferred 95 Rocky Hill Road to the plaintiff. Included with this quitclaim deed is a description of the property deeded to the plaintiff, which includes both 95 Rocky Hill Road and "any rights the Mortgagor may have in and to a certain parcel of land running easterly from the above described premises to Connecticut Highway Route 171, formerly known as the [OCP] . . . ." We presume that the defendant is claiming that the plaintiff, by incorporating exhibit A into her pleadings, admitted to owning the east branch of the OCP in "fee title." Otherwise, the argument would be nonsensical, because the plaintiff did not contest her ownership to 95 Rocky Hill Road. Second, the defendant alleged, in his counterclaim, that the separation agreement provided that he would construct a "similar" driveway and that he "constructed said driveway by June, 2010 . . . ." In her reply to the defendant's counterclaims, the plaintiff admitted these

allegations "to the extent [the driveway] was constructed . . . ."

The defendant overstates the import of the plaintiff's pleadings. "Fee title" is a word of little legal significance. It does not appear in prominent legal dictionaries. Instead, "fee title" appears to be an inartful description of fee simple ownership, a term that merely reflects ownership of "a whole or unlimited estate." *Frank Towers Corp.* v. *Laviana*, 140 Conn. 45, 52, 97 A.2d 567 (1953). The evidence considered by the trial court, however, addressed whether the plaintiff has *marketable* title to the property. It is well settled that "marketable title is one that can be sold at a fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as a security for the loan of money. . . . To render a title unmarketable, the defect must present a real and substantial probability of litigation or loss." (Citations omitted; internal quotation marks omitted.) Id., 52–53. The mere fact that the plaintiff admitted fee simple ownership of 95 Rocky Hill Road has no bearing on the marketability of the property. Similarly, the plaintiff's admission that a driveway was constructed across the east branch is not conclusive of whether the driveway was "similar" pursuant to the terms of the separation agreement. These admissions were not dispositive of the marketability of 95 Rocky Hill Road or the similar characteristics of the driveway constructed on the east branch. Therefore, the court did not err by admitting evidence concerning these issues.

IV

Lastly, the defendant claims that the court, *Cole-Chu, J.*, wrongly denied his motion to disqualify Judge Boland without a hearing. We disagree.

We first set forth the relevant standard of review. "Pursuant to our rules of practice; see Practice Book § 1-22; a judge should disqualify himself from acting in a matter if it is required by rule 2.11 of the Code of Judicial Conduct, which provides in relevant part that [a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned . . . . In applying this rule, [t]he reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . . Moreover, it is well established that [e]ven in the absence of actual bias, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned, because the appearance and the existence of impartiality are both essential elements of a fair exercise of judicial authority. . . . Nevertheless, because the law presumes that duly elected or appointed judges, consistent with their oaths of office, will perform their duties impartially . . . and that they are able to put aside

personal impressions regarding a party . . . the burden rests with the party urging disqualification to show that it is warranted. . . . A trial court's ruling on a motion for disqualification is reviewed for abuse of discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Hoffkins* v. *Hart-D'Amato*, 187 Conn. App. 227, 231–32, 201 A.3d 1053 (2019).

The following additional facts and procedural history are relevant to this claim. On June 9, 2017, Judge Boland issued his memorandum of decision, which granted the plaintiff a permanent injunction. A little more than two months later, on August 17, 2017, the defendant filed a motion to disqualify Judge Boland. In his motion and accompanying affidavit, the defendant alleged that Judge Boland should be disqualified and a new trial should be granted for two reasons: first, Judge Boland presided as the sentencing judge in a criminal trial in which the defendant was charged with breaking into the plaintiff's residence, 95 Rocky Hill Road, and the plaintiff attempted to offer testimony and evidence in support of the charges; and second, the plaintiff's trial counsel, Kimberly McGee, worked as the "chief deputy clerk" at the New London courthouse during the same time that Judge Boland was assigned there in 2011. The defendant further alleged that he was unaware of either of the disqualifying factors until after the judgment was rendered.

On September 18, 2017, Judge Boland held a hearing on the defendant's motion to disqualify. Judge Boland explained that he did "not intend to decide the motion to disqualify" and that, instead, he was going to "refer it to Judge Cole-Chu." During this hearing, Judge Boland clarified that the only time he served in the New London courthouse was when he presided over a criminal trial for four to five weeks that he believed spanned from 2010 to 2011. As the defendant claimed, Judge Boland recalled that McGee was the deputy civil clerk for the New London courthouse in 2011, but there was a separate deputy clerk for criminal matters. Judge Boland could recall no significant interaction with McGee and, at most, may have spoken to her briefly in the hallway once. At the conclusion of this hearing, Judge Boland referred the motion to Judge Cole-Chu.

In an order dated October 3, 2017, the court, *Cole-Chu*, *J.*, denied the defendant's motions to disqualify Judge Boland and to open the judgment. In that order, the court concluded that "the defendant has presented no sufficient evidence that Judge Boland's impartiality might reasonably be questioned, or even that Judge Boland should, under the circumstances, have disclosed

(a) that he served in a judicial district in which the plaintiff's counsel was a deputy chief clerk, or (b) that he presided over a criminal case in which the defendant in this case was the defendant." The court further concluded that, in regard to the defendant's prior criminal trial, the defendant waived his claim to disqualify Judge Boland by his pretrial silence.

We begin by noting that the court correctly determined that the defendant waived his claim that Judge Boland should be disqualified on the basis of his connection to the defendant's criminal trial. "It is well settled that, in both civil and criminal cases, the failure to raise the issue of [judicial] disqualification either before or during the trial, can be construed as the functional equivalent of consent in open court . . . . This is because we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, *for a cause which was well known to them before or during the trial*. We have repeatedly indicated our disfavor with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment of such errors as grounds of appeal. . . . Thus, to consent in open court, the parties must know or have reason to know of the judge's participation in the trial proceedings and the facts that require the judge to disqualify himself, but, nonetheless, fail to object in a timely manner." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 530, 911 A.2d 712 (2006). As a defendant in the criminal proceeding before Judge Boland, the defendant certainly had cause to know of his own prior interactions with Judge Boland. Therefore, by not objecting until after Judge Boland issued a decision adverse to the defendant's interests, the defendant consented to whatever impropriety, if any, existed as a result of those interactions and waived his right to challenge Judge Boland's decision on this basis.

Next, we conclude that the court did not abuse its discretion when it denied the defendant's motion to disqualify Judge Boland for his alleged prior interactions with McGee.[2] On appeal, the defendant claims that the court abused its discretion for two reasons: first, the court did not conduct a hearing on the motion for disqualification and, second, an objective observer would have concluded, on the basis of his prior connection to McGee, that Judge Boland could not have remained impartial.

"In order to require an evidentiary hearing before another judge on a motion for disqualification, the party asserting bias of the trial judge must state facts on the record which, if true, give fair support to his claim. If

those facts, taken as true, give that fair support, the party is entitled to an evidentiary hearing on those facts before another judge." (Internal quotation marks omitted.) *Rozbicki* v. *Gisselbrecht*, 152 Conn. App. 840, 852, 100 A.3d 909 (2014), cert. denied, 315 Conn. 922, 108 A.3d 1123 (2015).

After a careful review of the record, we conclude that the defendant's two claims must fail for the same reason: the defendant offered insufficient evidence to support the disqualification of Judge Boland. The only evidence offered in support of the defendant's motion was that, for a very brief window of time, Judge Boland and McGee had worked in the same building. Any interaction between Judge Boland and McGee during this short period occurred more than six years before the present case was decided. The defendant did not offer any further evidence to support his claim that Judge Boland's impartiality was compromised by a single workplace interaction. Moreover, as Judge Boland clarified, McGee worked as a deputy chief clerk for civil matters whereas Judge Boland was assigned to a criminal trial in the same courthouse; consequently, the two would have had little interaction during that brief period of time. In the absence of further allegations to substantiate the defendant's claim, there was no "fair support" to his claims that would have entitled him to a hearing. See id. Therefore, the court did not err by denying him a hearing before another judge nor did it abuse its discretion by denying his motion to disqualify Judge Boland.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] We note that the defendant's brief does not specifically identify the judicial admissions that he claims are binding on the plaintiff.

[2] We note that, unlike the defendant's other claim of impropriety, the defendant did not have reason to know of McGee's prior employment as the deputy civil clerk for the New London courthouse. Thus, he did not consent to this alleged issue by not raising McGee's connection to Judge Boland until after trial.